STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
DANIEL ARTIS, DEFENDANT-APPELLANT.

Argued December 2, 1969—Decided September 15, 1970.

*Mr. Anthony C. Blasi* argued the cause for defendant-appellant.

*Mr. David S. Baime,* Assistant Prosecutor, argued the cause for plaintiff-respondent (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney; *Mr. Baime,* on the brief).

PER CURIAM. Defendant was convicted of the first degree murder of George Kayser. The jury made no recommendation so the death penalty was imposed. The State's theory of this particularly gruesome homicide was felony murder, occurring in connection with the perpetration of a robbery of the decedent's person. There was no doubt from the medical evidence that death was caused by an automobile running over decedent's body while he lay upon the ground in an alley in Orange in an intoxicated condition. The prosecution's proofs sought to establish that defendant had just robbed the decedent and had deliberately driven the car over his body to dispose of him and to preclude defendant's identification as the robber. The principal defense was alibi.

The State's case rested essentially upon the testimony of two men, McClain and Newkirk, who were friends of defendant and said they were with him and decedent at the time in question, and upon some especially incriminating physical evidence.

McClain testified that he met defendant and Newkirk in an Orange tavern late in the evening of September 11, 1967. A bottle of wine and one of gin were purchased and the three went outside to a car, which proved to be the decedent's, parked nearby. The decedent, a white man (all the others involved were black) whom McClain had never seen before, was sitting in the front seat on the passenger side, drinking out of another bottle. His condition was described as "real high." A fifth man, one Johnson, known to McClain, was seated in the back seat of the car, very drunk. Defendant entered the driver's seat and McClain and Newkirk got in the rear. They proceeded to drink out of the recently acquired bottles. Some little time later they decided "to go somewhere," with defendant driving. They took Johnson home and then cruised about Orange streets to a point where defendant stopped the car and made a gesture to McClain to grab the decedent around the head, which he did. Defendant then got out of the car, took McClain's position in the rear seat, grabbed the decedent from the back, rifled his pockets and removed his wallet. McClain then, at defendant's direction, drove the car into the alley some distance away. He, defendant and Newkirk got out of the car and defendant pulled the decedent, now helpless, out onto the ground. Defendant straddled the decedent and started to choke him. McClain asked defendant what he was going to do and he replied that "the man with the car knew his name * * * so he said that he was going to kill him." McClain protested and defendant said he "was going to run him over." Whereupon McClain left the scene on the run. On his way out of the alley he heard the wheels of the car spinning.

Newkirk's story was substantially in accord with McClain's although perhaps implicating McClain more deeply in the robbery and assault of decedent. (The witnesses were sequestered and did not hear each other testify). Newkirk said that he was an eye-witness to the killing. After McClain left the alley, he said defendant got into the driver's seat and directed him to seat himself on the passenger's side of the front seat. Defendant then backed the car, turned it around to go out the alley and "ran over the man going out the alley." Newkirk said he jumped from the car when it stopped for a red light and made an anonymous telephone call to Orange police headquarters, advising that there was a body in the alley. He further stated that he met the defendant about a month later who said "You know, nobody ain't killed the white man but me."

The car was found against a tree on a street in East Orange some time later that night, with the decedent's wallet lying on the rear seat and the registration in his name in the glove compartment. Defendant's fingerprint was discovered on the left door adjoining the driver's seat and there was fresh blood on the frame underneath the car.

Defendant was not arrested until some months later, when he surrendered to police at his attorney's office in Newark. After he was brought to Orange police headquarters and directed to empty his pockets and wallet, a pawn ticket was found in the wallet. Investigation thereof disclosed that it covered a wristwatch, identified by the decedent's sister with whom he lived as belonging to him. The ticket stub in the pawnbroker's possession contained a fictitious name, but the address given was that of defendant's residence in Newark.

Defendant's story was that he had met the decedent for the first time on the morning of September 11, when the latter was in his car in the company of a friend of defendant's. Defendant, the decedent and various other friends of defendant, including Johnson, spent most of the day drinking in various taverns and in a trip in the car to Newark to defendant's lawyer's office to borrow some money. He

said he last saw the decedent in one of the taverns at about 6:00 P.M. and had seen Newkirk only early in the evening. He denied having seen McClain at all or having been in the alley at any time that day. He claimed that he left a tavern for the last time about 8:15 P.M., went to the home of a relative for a while and returned to his home at about 10:00 P.M. when he went to bed. No witnesses were called to substantiate the alibi and no explanation was offered concerning the pawn ticket.

Defendant also stressed his physical condition at the time. He had injured his legs in a motor vehicle accident many months before and said that his leg movements were so restricted that he could not perform many of the movements attributed to him and that he had to use crutches. (McClain testified the crutches were on the floor of the rear seat of decedent's car during the entire period involved). There was considerable testimony, however, that defendant did not use the crutches at any time on the day in question. He disclaimed driving the decedent's car at any time and said that he had entered the vehicle only from the right door.

Our thorough study of the full trial transcript demonstrates that many of defendant's contentions are so lacking in merit as not to require extensive discussion.

Defendant urges that the jury verdict was against the weight of the evidence because the testimony of McClain and Newkirk "was so fraught with inconsistencies and contradictions as to render such testimony incredible." While there were some differences between them as to certain details, the variations were not vital or particularly significant. Clearly they did not even approach the point of requiring it to be said that their testimony was beyond belief. The differences were simply matters for jury consideration in assessing credibility. The evidence was more than ample to find defendant guilty of first degree murder. The devastating effect of the physical evidence, especially the pawn ticket for the decedent's watch found in defendant's possession, itself fully justified the jury in believing the vital ele-

ments of the stories told by McClain and Newkirk and disbelieving the defendant's version of the day's events.

Defendant also suggests errors by the trial court in limiting cross-examination of certain State's witnesses and in failing to grant a mistrial based on certain comments of the prosecutor during the trial, as well as urging plain error in comments during the State's summation upon defendant's failure to produce witnesses in support of his alibi. We are satisfied, without dealing with the points in detail, that no prejudicial error whatever was committed in any of the respects complained of.

Defendant further advances three contentions related to the charge. The first concerns the refusal of the trial judge to charge manslaughter as a possible verdict. The charge limited the verdict to felony (first degree) murder, second degree murder or acquittal. Manslaughter was specifically excluded. The argument is based on the theory that the prosecution evidence, viewed in the light most favorable to defendant, could be taken to indicate that his running over decedent's body with the car was accidental and amounted only to criminal negligence rather than a deliberate act. Since the jury found first degree rather than second degree murder, it is indeed far fetched to think that it would have returned a manslaughter verdict even if that crime had been charged as a possibility. But more important, we fail to find any evidence which would support such a theory. It is elementary that a trial judge should not instruct as to a possible verdict as to which there is no proof. *State v. Sinclair*, 49 *N. J.* 525, 540 (1967). The defendant is, of course, entitled to utilize facts of justification or mitigation arising out of the most favorable view of the evidence produced against him, even though he does not affirmatively espouse that view, and to a charge based thereon. *State v. Williams,* 29 *N. J.* 27, 31 (1959). (Here defendant did not suggest an accidental killing either in opening or summation). The only evidence defendant points to in support of the manslaughter possibility is Newkirk's testimony that, after the

decedent had been pulled out of the car and lay on the ground and McClain had left, defendant backed the car, turned it around, and "ran over the man going out the alley." The suggestion is that this language could be considered as indicative of an accidental occurrence. But this testimony has to be read in context with that of McClain and the remainder of Newkirk's, which recited defendant's assaulting and choking the decedent and saying that he was going to kill him and "was going to run him over." Taken as a whole, it cannot reasonably be said that Newkirk meant anything less than that defendant deliberately ran over decedent in the alley or that a jury could think otherwise. We are convinced the trial court properly refused to charge manslaughter as a permissible verdict.

The second claim of error in the charge, asserted as plain error since the matter was not raised at the trial, is the failure to instruct the jury that if the felony (robbery) had been completed at the time defendant rifled decedent's person before they reached the alley and some minutes prior to the killing, the felony murder rule was not applicable. Parenthetically it may be noted that, even if no felony was involved in the killing, the trial judge could have properly left to the jury under the proofs the possibility of a first degree murder conviction based on a willful, premeditated and deliberate killing. The trial court did charge that the jury could find defendant guilty of first degree murder if the killing occurred while he was engaged in perpetrating or attempting to perpetrate a robbery of decedent, but if the killing did not so occur, he could only be found guilty of second degree murder. We are satisfied that under the established law in this state the jury could properly find that the killing did occur during the perpetration of a robbery and that the trial judge's instruction in this connection was adequate and not erroneous. In fact, the charge as given was overly favorable to the defendant since, under the prosecution proofs, the court would have been justified in telling the jury that

the felony had not been legally completed at the time of the killing, for purposes of the felony murder rule.

This is so because New Jersey follows fully the so-called *res gestae* theory in this connection. That thesis is well set forth in the opinion of the Court of Errors and Appeals in *State v. Gimbel*, 107 *N. J. L.* 235, 240–241 (E. & A. 1930):

> The robbery had not been completed so far as the killing in the perpetration of the robbery was present. *State v. Turco*, 99 N. J. L. 96, 122 A. 844 is entirely apposite on the question of robbery involved in this case. In the Turco case we held that when, incident to a robbery, one of the robbers kills a third party after the goods have been taken out of the possession of the owner (or his agents), while the robbery is complete, so as to render the perpetrators liable to conviction for it, yet the killing being done in an attempt to conceal the crime, protect the robbers in the possession of the loot and facilitate their flight, is so closely connected with the robbery as to be a part of the *res gestae* thereof, which may be an emanation of the act of robbery, and, although an act committed after the fact of robbery it still constitutes part of the *res gestae* of that act, and is murder committed in the perpetration of a robbery within the meaning of our statute, and, consequently, murder in the first degree. * * *

See also *State v. Mule*, 114 *N. J. L.* 384, 392–393 (E. & A. 1935); *State v. Hauptmann*, 115 *N. J. L.* 412, 427–428 (E. & A. 1935), *cert. den.* 296 *U. S.* 649, 56 *S. Ct.* 310, 80 *L. Ed.* 461 (1935); *State v. Metalski*, 116 *N. J. L.* 543 (E. & A. 1936); *State v. Zupkowsky*, 127 *N. J. L.* 218, 224 (E. & A. 1941). 2 Schlosser, *Criminal Laws of New Jersey* (3rd ed. 1970) § 57.18. Perkins, *Criminal Law* (1957) 35. While some jurisdictions hold that a killing occurring during an attempt to escape after the felony has taken place is not within the felony murder rule and our application of it in such situations has been the subject of dissent here (see 1 Wharton, *Criminal Law and Procedure* (Anderson ed. 1957) § 251, p. 541; *State v. Metalski, supra*, dissenting opinion, 116 *N. J. L.* at 553), there can be no doubt in the instant case, under the evidence for the prosecution, that this killing "was woven into the fabric of the planned crime, and was

inseparable from it." *State v. Mule, supra,* 114 *N. J. L.* at 392. Insofar as the felony murder rule is concerned, defendant's direction to McClain to drive into the alley after the robbery of the intoxicated victim had taken place and his statements that he was going to kill decedent because the latter knew his name clearly demonstrate that the killing must be said to legally have occurred in the perpetration of the robbery.

The third contention of error in the charge is the failure to give the "accomplice rule", *i. e.,* a specific cautionary instruction that the evidence of an accomplice is to be carefully scrutinized and assessed in the context of his interest in the proceeding. The claim is made as plain error since the charge was not requested. Reference was, of course, intended to be made to the testimony of McClain at least, who by his own story and that of Newkirk, was a participant in the robbery. While a defendant is entitled to such a charge if requested and a judge may give it on his own motion if he thinks it advisable under the circumstances, it is generally not wise to do so absent a request, because of the possible prejudice to the defendant. *State v. Begyn,* 34 *N. J.* 35, 54–56 (1961) ; *State v. Gardner,* 51 *N. J.* 444, 460–461 (1968). Certainly it is not error, let alone plain error, for a trial judge to fail to give this cautionary comment where it has not been requested. In any event, in this case the jury had been told, upon cross-examination of McClain, that he had been threatened with a charge of murder unless he gave the police a statement as to defendant's acts and the court did charge that, in determining the credibility of witnesses, the jury should take into account the interest of a witness in the outcome of the trial.

Finally, defendant raises certain constitutional issues. The first concerns the selection of the jury in the light of *Witherspoon v. Illinois,* 391 *U. S.* 510, 88 *S. Ct.* 1770, 20 *L. Ed.* 2d 776 (1968), and *State v. Mathis,* 52 *N. J.* 238 (1968). While conceding that the jurors excused for cause because of scruples aaginst capital punishment technically met the test

set forth in *Witherspoon* and *Mathis,* he urges that the manner in which their questioning was conducted did not fairly examine or evaluate their positions on the death penalty and that it was too mechanical.

The point relates to 18 veniremen, out of the total of 87 examined, who were excused for this cause. 36 were also excused by consent. The prosecution exercised 11 peremptory challenges and the defense 8; neither utilized all available challenges. See *R.* 1:8–3(d) (formerly *R. R.* 3:7–2(c)). It is especially to be noted that defendant did not object to the granting of a challenge for cause in any instance. In fact, counsel, in answer to the court's query, expressly assented each time.

The contention is based on the form of a question put to these veniremen by the judge. The inquiry was made either when the prospective juror had been adamant and positive in his views against capital punishment from the beginning of the examination or when the prior questioning, frequently quite lengthy, had produced ambiguous, equivocal or unresponsive answers. In such instances the judge would typically inquire:

When you say you don't approve of the death penalty, are you saying to me that in no event, under no circumstances, regardless of what the evidence may disclose, would you vote for the death penalty? Is that what you are saying?

This query would generally be preceded or followed by a comment reminding the examinee that the jury had the discretion and choice to decide on either life imprisonment or death after guilt had been found and by a further question inquiring whether the person was also saying that in every case he would vote for life imprisonment regardless of the proofs. If all of this produced clear and positive responses of refusal or inability to consider the death penalty, the challenge for cause was granted.

The controlling principle of *Witherspoon* was summarized in *Mathis* as follows:

As we understand *Witherspoon*, it holds that, at least for the time being, the State is entitled to a jury which is "neutral" on the subject of penalty, and to that end may challenge for cause a juror who "would not even consider returning a verdict of death" (88 *S. Ct.*, at p. 1776), but that a jury is not representative of the community and hence is not impartial if "it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction" (88 *S. Ct.* 1777). In other words, we read *Witherspoon* to recognize that the State is entitled to jurors who are impartial as to punishment, but it holds that a juror is impartial even though he has a bias against the State upon that topic, provided his bias is not so strong as to preclude him from considering the issue of punishment. Although a lesser bias might constitute "cause" if it ran against a defendant (*i. e.*, racial, religious, or ethnic prejudice), the bias here involved is deemed to be logically relevant to the question whether the death penalty should be imposed in a given case and hence a jury would be unrepresentative of the community conscience if there were excluded all who would have a distaste for capital punishment. But the State is entitled to "a jury *capable* of imposing the death penalty" (88 *S. Ct.* at *p.* 1776; emphasis added). (52 *N. J.* at 243-244)

To this may be added two pertinent sentences from *Witherspoon*:

\* \* \* Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position. (391 *U. S.* at 515, n. 9, 88 *S. Ct.* at 1774, 20 *L. Ed.* 2d at 781)

\* \* \* The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. \* \* \* (391 *U. S.* at 522, n. 21, 88 *S. Ct.* at 1777, 20 *L. Ed.* 2d at 785)

See also *Maxwell v. Bishop,* 398 *U. S.* 262, 90 *S. Ct.* 1578, 26 *L. Ed.* 2d 221 (1970).

Examination of the *voir dire* transcript makes it clear that the trial judge correctly understood the controlling principle. See *State v. Mathis, supra* (52 *N. J.* at 250–251). He was obviously attempting to find out from the patently adamant or the ambiguous and equivocal venireman, following the preliminary questioning, whether the prospective juryman was willing to or could *consider* all of the penalties provided by our law and whether he was irrevocably committed to vote against the death penalty regardless of the evidence and circumstances. Both sides, as well as the court, were entitled to a final clear and unambiguous expression of the juror's views thereon. We are satisfied the examinations were adequate, not merely perfunctory or productive only of general objections to the death penalty. While the questions pointed to might perhaps have been better framed in the affirmative rather than in the negative, it is plain to us from the transcript that the particular jurors excused for cause would have expressed the same positive opinion even if the questions had been so framed or the inquiry had been more extensive and that this was fully realized by the very experienced trial judge. We are thoroughly convinced, even without regard to defendant's acquiescence, that the questions of the judge were within the ambit of the quoted principles and that no reversible error exists in this connection. *Cf. Ladetto v. Commonwealth,* 356 *Mass.* 541, 254 *N. E.* 2d 415 (1969).

Defendant's other constitutional argument has several facets, all of which this court has previously rejected. The first is a claim of unconstitutionality of *N. J. S.* 2A:113–3 precluding the death penalty if the court accepts a *non vult* plea to a murder indictment and is based on the claimed analogous decision of the United States Supreme Court in *United States v. Jackson,* 390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed.* 2d 138 (1968). The other facets relate to claims of invalidity directed to the procedure prescribed by *N. J. S.* 2A:113–4 in that the same jury in the same trial determines both punishment and guilt in a first

degree murder case on whatever evidence may be presented and without any prescribed standards for its decision as to death or life imprisonment. The validity of our procedure in all these respects was sustained by a divided court in *State v. Forcella,* 52 *N. J.* 263 (1968), a conclusion to which we continue to adhere. These issues are, however, pending before the United States Supreme Court in cases from this and other jurisdictions having similar procedures.[1] Since a death sentence is involved, we think the entry of our judgment in this case should be withheld until that court has decided these questions definitively. *Cf. State v. Conklin,* 54 *N. J.* 540, 549–550 (1969).

The judgment of the County Court is affirmed but entry of such judgment in this court is directed to be withheld until our further order.

*For affirmance but withholding entry of judgment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.

---

[1]Forcella filed a petition for certiorari in the United States Supreme Court on October 1, 1968. The matter was rendered moot, however, by his death from natural causes before the petition was determined and it has been dismissed for that reason. 397 *U. S.* 959, 90 *S. Ct.* 999, 25 *L. Ed.* 2d 252 (1970). One Funicello, who was also a party involved in the Forcella appeal in this court (52 *N. J.* 263) joined in Forcella's petition for certiorari (No. 18 Misc.) and we understand that the petition has not yet been acted upon by the Supreme Court as to him.