605 A.2d 1097

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. EARL ADAMS, A/K/A KAHLID, DEFENDANT–APPELLANT.

Argued October 8, 1991—Decided May 11, 1992.

*Bernadette DeCastro,* Assistant Deputy Public Defender, argued the cause for appellant (*Wilfredo Caraballo,* Public Defender, attorney).

*Virginia M. Lincoln,* Assistant Prosecutor, argued the cause for respondent (*Herbert H. Tate, Jr.,* Essex County Prosecutor, attorney).

*Teresa A. Blair,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Robert J. Del Tufo,* Attorney General, attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

A jury convicted defendant, Earl Adams, of purposeful or knowing murder and of four weapons-possession charges. He contends that the trial court's admission of his oral statements in response to a police interrogation was reversible error because he had not validly waived his constitutional protection against self-incrimination. At the interrogation he had refused to sign a written statement but had volunteered to discuss the events surrounding the victim's death.

The Appellate Division affirmed the convictions, and we granted defendant's petition for certification, 126 *N.J.* 321, 598 *A.*2d 881 (1991). We hold that defendant's invocation of his right to silence for written statements only did not preclude admission of oral statements that he made at his interrogation. We therefore affirm.

–I–

The events leading up to the death of the victim, Joseph Beaulieu, originated in what has come to be recognized as "a drug deal gone bad." The victim's friend, Arnold, gave defendant $80 in exchange for cocaine. Believing that he had been "short-weighted," Arnold, accompanied by Beaulieu and two women, confronted defendant. According to the State, when questioned by Beaulieu, Adams produced a gun and shot the victim. According to Adams, he was unarmed when Beaulieu and the others complained angrily about the drug transaction. He testified at trial that Beaulieu had brandished a gun and had hit defendant with it. Beaulieu then dropped the gun, and although several people lunged for it, defendant picked it up. Just then, Arnold swung a machete, which hit defendant's hand and caused the gun to fire accidentally. The bullet struck and killed Beaulieu.

Defendant fled from the scene. The police obtained a warrant for his arrest, and defendant surrendered three days after the shooting.

On turning himself in, defendant was immediately placed under arrest by Detective William Thomas, who informed him of his rights as required by *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966). Detective Thomas then gave defendant a form to read, entitled "Preamble to Signed Statements (Miranda Warning)." At the officer's request, defendant read the first line aloud to demonstrate literacy; he then read the rest to himself. The form listed defendant's rights and contained a waiver. Defendant told Detective Thomas that although he did not wish to sign a written statement, he would talk about the incident. He then wrote on the form "I do not wish to give a statement at this time," and signed it.

Defendant thereupon told the officer that Beaulieu had approached him with a machete, demanding that defendant return the $80 that Arnold had given him, and that defendant had turned to run away, had taken the gun, and had shot over his shoulder.

A grand jury returned an indictment charging Adams with knowing and purposeful murder, contrary to *N.J.S.A.* 2C:11–3a(1) and (2); first-degree armed robbery, contrary to *N.J.S.A.* 2C:15–1; two counts of third-degree unlawful possession of a handgun without a permit, contrary to *N.J.S.A.* 2C:39–5b; and two counts of second-degree possession of a handgun for unlawful use against another person, contrary to *N.J.S.A.* 2C:39–4a.

Defendant sought to suppress the oral statement he had made during the interrogation. At a *Miranda* hearing, Detective Thomas testified that he had inferred from their conversation that defendant had intended to invoke only his right not to make a written statement. Cross-examination produced the following exchange between defense counsel and Detective Thomas:

Q. Did you make him aware that your records, you would then tell the jury what he said?

A. I once again repeat he understood that, and I told him that.

Q. How did he indicate he understood that?

A. By his conversation telling me, well, okay, but I am not going to give you a signed statement, and the man is intelligent enough, impressed me to be intelligent enough to understand what I am telling him.

Q. Did you tell him that the oral statement can be used against him in a court of law?

A. I repeat again, I told him that what he told me would be incorporated in my record and I would have to testify from my records in court.

\* \* \* \* \* \* \* \*

Q. How did you learn from [defendant] he knew [that an oral statement would be used and given to the jury]?

A. I am talking to him, it's my impression from him he knows I am telling him I am going to incorporate what he is telling me. He says all right, but I am not going to give you a signed statement. He knew the difference between a signed statement and my report.

In denying the motion to suppress, the trial court made the following findings of fact: (1) Detective Thomas properly informed defendant of his constitutional rights; (2) defendant read those rights and signed them with an indication of his refusal to give a statement; (3) although defendant refused to sign any written statement, he indicated a willingness to tell the officer what had happened and attempted to exculpate himself by telling the officer that Beaulieu had attacked him with a machete and defendant had shot over his shoulder; (4) defendant made his oral statements after being advised of his constitutional rights; and (5) defendant fully understood his constitutional rights and did not intend to give a written statement but only to tell his version of the events leading to Beaulieu's death.

The jury acquitted defendant of robbery but convicted on the other charges. The trial court sentenced defendant to life in prison with thirty years' parole ineligibility for the murder, four years' imprisonment for unlawful possession of a handgun without a permit, and seven years' imprisonment for unlawful possession of a handgun for unlawful use against another person, the latter sentences to run concurrently with the murder sentence. For sentencing purposes, the court merged the duplicative weapons-possession charges. The court also assessed $90 in Violent Crimes Compensation Board penalties.

On appeal defendant claimed that the trial court had improperly admitted his oral statements made at the interrogation; that improper conduct by the prosecutor during his closing argument had prejudiced defendant's state and federal fair-trial rights; that the trial court should have charged passion/provocation manslaughter; that the trial court had abused its discretion by admitting a prior conviction to impeach defendant if he testified at trial; and that the trial court had committed reversible error by allowing an investigator from the prosecutor's office to offer expert testimony regarding ballistics.

The Appellate Division affirmed in an unreported opinion. The court found that defendant had waived his right to silence "knowingly, voluntarily and intelligently" and that the police had scrupulously honored his right to remain silent. We limited our grant of defendant's petition for certification to the single issue of whether police conduct at defendant's interrogation had violated his constitutional right against self-incrimination. We hold that under both federal constitutional law and State common law, defendant's invocation of his right to silence only for written statements did not preclude admission of oral statements he had made at his interrogation.

–II–

–A–

Federal and state courts have developed an intricate body of law addressing the means and effect of a suspect's waiver of the constitutional rights of silence and of counsel (also an integral part of New Jersey's common law. See, *e.g., State v. Hartley,* 103 *N.J.* 252, 260, 511 *A.*2d 80 (1986).). The United States Supreme Court stated in *Miranda, supra,* that procedural safeguards were necessary "to assure that the exercise of the right [of silence] will be *scrupulously honored*[.]" 384 *U.S.* at 478–79, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726 (emphasis added). In *Michigan v. Mosley,* 423 *U.S.* 96, 96 *S.Ct.* 321, 46 *L.Ed.*2d 313 (1975), that Court found that police had scrupulously honored the defendant's invocation of the right to silence

when they ceased questioning after the defendant's invocation of his rights, waited more than two hours after that invocation, and issued fresh *Miranda* warnings before questioning the defendant about a crime unrelated to the one about which he had asserted the right to silence. *Id.* at 104–07, 96 *S.Ct.* at 326–28, 46 *L.Ed.*2d at 321–23.

■ This Court has imposed a bright-line, state-law rule stating that once a defendant invokes the right to silence, officers may not resume questioning until they have issued fresh *Miranda* warnings. *Hartley, supra,* 103 *N.J.* at 256, 511 *A.*2d 80.

■ In *Hartley,* we defined the analysis to be used in deciding whether to suppress a confession alleged to have been extracted in violation of a defendant's constitutional protection against compelled self-incrimination. A court's first inquiry is whether the suspect invoked the right to silence. Once it finds that invocation, the court should next determine whether law-enforcement officials have scrupulously honored the suspect's right to silence under the Fifth and Fourteenth Amendments. 103 *N.J.* at 261, 511 *A.*2d 80. Lastly, if the suspect has invoked the right to silence and law-enforcement officials have scrupulously honored that right, the court must ascertain whether the confession is a result of the suspect's knowing, voluntary, and intelligent waiver of the right against self-incrimination. *Ibid.* If the police have not scrupulously honored the suspect's right to silence, the court should not reach the waiver issue. "Care must be taken * * * that there be no blurring of the separate lines of analysis that are followed in respect of the 'scrupulously honor' requirement on the one hand and the waiver issue on the other." *Ibid.*

■ When a defendant does not invoke his or her *Miranda* rights, an examination of whether those rights were scrupulously honored is not necessary, and the inquiry must focus on whether the defendant's waiver was knowing, intelligent, and

voluntary. *State v. Gerald,* 113 *N.J.* 40, 117, 549 *A.*2d 792 (1988).

-B-

Defendant refused to make a written statement but was willing to make an oral statement. However, he contends that by invoking his right not to make a written statement and writing "I do not wish to give a statement at this time" on the *Miranda* waiver form, he unequivocally invoked the right to silence for all purposes. He also claims that because Detective Thomas realized that defendant believed that only a signed statement was admissible, and because the officer did not clarify the alleged misconception, the waiver was neither knowing, intelligent, nor voluntary. The State counters that defendant's invocation included only written statements. The Appellate Division found that defendant had completely invoked the right to silence, but had knowingly, voluntarily, and intelligently waived it almost immediately afterwards by offering to discuss the shooting with Detective Thomas.

■ Defendant never invoked the right to silence beyond his refusal to sign a written statement. Any confusion about his intent when he wrote "I do not wish to give a statement at this time" is dispelled by his contemporaneously-stated, unambiguous willingness to talk to Detective Thomas about the circumstances surrounding the shooting. (Furthermore, Detective Thomas scrupulously honored defendant's rights to the extent of the invocation: when defendant refused to give a written statement, the officer dropped the matter.)

In *Connecticut v. Barrett,* 479 *U.S.* 523, 107 *S.Ct.* 828, 93 *L.Ed.*2d 920 (1987), the Supreme Court held that a defendant can invoke Fifth Amendment protection against self-incrimination for a limited purpose, and that statements outside the scope of that invocation are admissible. *Id.* at 529, 107 *S.Ct.* at 832, 93 *L.Ed.*2d at 928. The circumstances in *Barrett* were similar to those presented in this case: local police informed the

defendant of his rights and he signed and dated a form acknowledging those rights. Barrett also told the police that although he refused to give a written statement without counsel present, he was willing to discuss the incident. *Id.* at 525, 107 *S.Ct.* at 830, 93 *L.Ed.*2d at 925–26. The Court reasoned that "Barrett's limited requests for counsel * * * were accompanied by affirmative announcements of his willingness to speak with the authorities," and that therefore he had simply taken advantage of the right that *Miranda* affords defendants "to choose between speech and silence * * *." *Id.* at 529, 107 *S.Ct.* at 832, 93 *L.Ed.*2d at 928.

Defendant attempts to distinguish *Barrett* on the ground that although Barrett had been unambiguously willing to talk and had clearly understood the *Miranda* warnings, the same is not true in this case. The argument is unpersuasive. Defendant's desire to discuss the shooting with Detective Thomas was entirely unambiguous, and, as the trial court found, he thoroughly understood his rights. The waiver sheet that he read and signed said: "Anything you *say* can be used against you in a court of law" (emphasis added). Moreover, Thomas told Adams that "what he is telling me" would be included in the detective's report and would form the basis for Thomas' testimony in court.

–III–

A suspect's waiver of his Fifth Amendment right to silence is valid only if made "voluntarily, knowingly and intelligently." *Miranda, supra*, 384 *U.S.* at 444, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 707; *cf. State v. Kennedy*, 97 *N.J.* 278, 286, 478 *A.*2d 723 (1984) (regarding waiver of right to counsel). In New Jersey, the State must demonstrate validity of waiver beyond a reasonable doubt. *State v. Gerald, supra*, 113 *N.J.* at 118, 549 *A.*2d 792 (citing *State v. Bey*, 112 *N.J.* 123, 134, 548 *A.*2d 887 (1988); *State v. Miller*, 76 *N.J.* 392, 404–05, 388 *A.*2d 218 (1978); *State v. Kelly*, 61 *N.J.* 283, 294, 294 *A.*2d 41 (1972); *State v. Yough*, 49 *N.J.* 587, 600–01, 231 *A.*2d 598 (1967)). The trial

court must make its determination by examining the totality of the circumstances. *Johnson v. Zerbst*, 304 *U.S.* 458, 464, 58 *S.Ct.* 1019, 1023, 82 *L.Ed.* 1461, 1466 (1938) (determination depends on "particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused").

 Defendant claims that his oral statement was not a knowing, intelligent, and voluntary waiver of his Fifth Amendment rights. He argues that Detective Thomas knew that defendant believed that an oral statement could not be used against him at trial, and that the officer failed to rectify the misconception. (Defendant has never contended that he actually believed his oral statements to be inadmissible.) However, the trial court found that Detective Thomas had properly advised defendant of his Fifth Amendment rights and that defendant understood them when he made his statement. The responsibility of law-enforcement authorities to inform defendants of their rights ends with the proper administration of *Miranda* warnings. *State v. McKnight*, 52 *N.J.* 35, 47, 55, 243 *A.*2d 240 (1968); *cf. Patterson v. Illinois*, 487 *U.S.* 285, 292–94, 108 *S.Ct.* 2389, 2395–96, 101 *L.Ed.*2d 261, 272–73 (1988) (holding that because *Miranda* warnings make defendant aware of right to counsel and of consequences of waiving Sixth Amendment rights, defendant's waiver of right to counsel after receiving such warnings is valid). That Detective Thomas told defendant his Fifth Amendment rights, gave him a waiver form to read, ensured that defendant was able to read and had read the form, and informed defendant that the detective's testimony in court would be based on defendant's oral recitation as included in the investigation report are all undisputed.

The concurrence argues that any invocation of the right to silence embraces that right as it relates to all forms of communication, noting the obvious fact that a conviction based on an oral statement is just as onerous as one based on a written statement. *Post* at 454, 605 *A.*2d at 1104. The facts of this

case undercut the former assertion. Detective Thomas properly informed defendant of his rights. Whatever reason Adams had for choosing to invoke his right to silence with respect only to written statements clearly did not include ignorance of those rights. Adams' decision, unwise though it may have been, was expressed with no ambiguity whatsoever.

Speaking to the question of waiver of the right to silence, this Court has held that the imprudence of a defendant's waiver does not alter our conclusion that the waiver was otherwise knowing, intelligent, and voluntary. A defendant's waiver is not unintelligent merely because it is unwise. In *McKnight, supra,* this Court declared that a properly-warned defendant's waiver is "no less 'voluntary' and 'knowing' and 'intelligent' because he misconceived the inculpatory thrust of the facts he admitted, or because he thought that what he said could not be used because it was only oral * * *." 52 *N.J.* at 55, 243 *A.*2d 240. "The Constitution is not at all offended when a guilty man stubs his toe." *Id.* at 52, 243 *A.*2d 240.

The United States Supreme Court adheres to the same rule. In *Colorado v. Spring,* 479 *U.S.* 564, 107 *S.Ct.* 851, 93 *L.Ed.*2d 954 (1987), the Court rejected the defendant's contention that his waiver of his Fifth Amendment rights did not extend to later questioning about a crime different from the one for which he had been arrested. The Court said, "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Id.* at 574, 107 *S.Ct.* at 857, 93 *L.Ed.*2d at 966; *accord Oregon v. Elstad,* 470 *U.S.* 298, 316, 105 *S.Ct.* 1285, 1297, 84 *L.Ed.*2d 222, 237 (1985) ("This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.").

■ A police officer has no duty to probe for a defendant's unstated misconceptions about the effect of the waiver of Fifth Amendment rights. *Cf. Elstad, supra,* 470 *U.S.* at 316, 105 *S.Ct.* at 1297, 84 *L.Ed.*2d at 237 (noting that law-enforcement

officers are "ill-equipped to pinch-hit for counsel" for the purpose of telling defendants about the admissibility of their statements). Furthermore, if defendant was confused about the legal effect of his making an oral statement, Detective Thomas was not the source of his confusion. As noted above, that the officer told defendant that the oral statement would go into the report from which he would testify is uncontroverted.

–IV–

Because defendant invoked his Fifth Amendment and common-law rights to silence only to the extent of written statements, and because his waiver regarding oral statements was knowing, intelligent, and voluntary, we affirm the judgment of the Appellate Division upholding defendant's convictions.

HANDLER, J., concurring.

The central concern of this appeal is the privilege against self-incrimination.

The Court characterizes defendant's refusal to give a signed statement as an invocation of the right to silence with respect to written communication and, conversely, it characterizes his willingness to speak as a waiver of his right to silence with respect to oral communication. *Ante* at 444, 446, 605 *A.*2d at 1100, 1101. Having applied those characterizations to defendant's acts, the Court is able to conclude that defendant selectively invoked his Fifth Amendment right to silence, that is, that he invoked it in part and waived it in part. The Court then determines that the police scrupulously honored defendant's partial invocation of the right to silence because the interrogation neither sought nor elicited a written statement. *Id.* at 446, 605 *A.*2d at 1101. The Court, finding that defendant fully understood his right to remain silent, is finally able to conclude that he knowingly, voluntarily and intelligently waived that part of his right to remain silent relating to oral communica-

tions when he made an oral statement. *Ante* at 447–450, 605 *A.*2d at 1101–1102.

I agree with the Court that defendant was sufficiently advised of his right to remain silent. I believe, however, that defendant initially made an ambiguous invocation of that right, thereby invoking that right in its entirety. I would also find that the police scrupulously honored defendant's right to silence, that the police clarified the *Miranda* warning to defendant as they were obligated to do, and that defendant, almost contemporaneously with the invocation of his right to remain silent, spontaneously gave an oral statement.

My differences with the Court revolve around two points. First, I do not believe that the right to remain silent is divisible. To allow the State to fractionalize the right to silence and to permit a defendant to invoke it in part and waive it in part greatly reduces the scope of the privilege against self-incrimination, seriously weakens that fundamental constitutional right, and undermines the efficacy of the *Miranda* protections. In addition, even if I were to accept the notion that the right against self-incrimination can be divided, I always would require officers confronted with suspects who waive their rights selectively to treat those waivers initially as ambiguous. The Court places heavy emphasis on the officer's helpful elaborations on the *Miranda* warnings but it refrains from establishing that bright-line rule at this time.

I

The facts of the case warrant careful recapitulation.

On April 9, 1988, Joseph Beaulieu was shot after an argument over a drug transaction. Adams became a suspect. Accompanied by his mother, he surrendered himself at the Newark police station and was arrested.

The *Miranda* warnings were recited to Adams. Detective William Thomas then gave defendant a form setting forth the *Miranda* warnings and a waiver of those rights. On reading

the form, defendant wrote above the signature line, "I do not wish to give a statement at this time."

According to Thomas, defendant stated that he "didn't want to give a signed statement but he would tell [him] what happened." Thomas then told defendant that he would incorporate what defendant told him into his report and that he would testify from that report in court. Thomas also described his explanation as "it's the same, what you tell me is going to be incorporated in my report, going to court." Thomas testified that in response defendant stated "all right, but I am not going to give you a signed statement" or "I am not going to sign it. I will tell you what happened, I am not going to sign it."

Defendant went on to give his account of the crime, indicating that the shooting had been in self defense. When Detective Thomas was asked whether he had questioned defendant while defendant was talking, the detective replied, "Somewhat, yes." Counsel asked defendant's mother whether she recalled Detective Thomas asking questions about the case and she responded, "My son was telling him about the case." The trial judge clarified the question for Ms. Adams by asking, "do you recall the detective asking him any specific questions about the case or was your son just talking about the case?" Ms. Adams answered, "He was just talking." Thomas then asked defendant what had happened to the gun, but when defendant said that "he didn't want to talk anymore about it" the conversation ended.

## II

The Fifth Amendment secures the right of an individual not to "be compelled in any criminal case to be a witness against himself." *U.S. Const.* amend V. The privilege protects a "complex of values," but the centerpiece of the privilege is the right "to remain silent unless [the person] chooses to speak in the unfettered exercise of his [or her] own will." *Malloy v. Hogan,* 378 *U.S.* 1, 8, 84 *S.Ct.* 1489, 1493, 12 *L.Ed.*2d 653, 659

(1964); *see also Miranda v. Arizona*, 384 *U.S.* 436, 460, 86 *S.Ct.* 1602, 1620, 16 *L.Ed.*2d 694, 715 (1966) (privilege grounded on principle that state should prove its case "by its own independent labors, rather than by the cruel, simple expedient of compelling [evidence] from [the defendant's] own mouth"). The testimonial nature of the privilege against self incrimination drives the scope of its protections. Thus, "[i]t is clear that the protection of the privilege reaches an accused's communications, whatever form they might take...." *Schmerber v. California*, 384 *U.S.* 757, 763–64, 86 *S.Ct.* 1826, 1832, 16 *L.Ed.*2d 908, 916 (1966).

The essence of the privilege against self-incrimination is to refrain from testimonial communication. The privilege, characterized as the right to remain silent, extends to any form of communication that is testimonial in nature. *Id.; State v. Irving*, 114 *N.J.* 427, 448–51, 555 *A.*2d 575 (1989) (Handler, J., dissenting) (notice of alibi is testimonial in nature); *In re Grand Jury Proceedings of Guarino*, 104 *N.J.* 218, 244–45, 516 *A.*2d 1063 (1986) (Handler, J., dissenting) (the implied admissions involved in the production of certain documents are testimonial in nature). Crucial to the privilege is whether the communication is "testimonial," not what form the communication happens to take. Hand-written notes, tape recordings, spoken words, physical gestures, and all other forms of communication are protected. It follows that if any communication is expressed in any form, then silence, as a right and as a fact, no longer exists, for the State acquires the ability to use the suspect's communication to convict.

Because the capacity to incriminate inheres in the testimonial content of the communication—not in its comparative weight or probative worth—it makes no sense to consider testimonial communication in one form to be different from testimonial communication in another for purposes of the privilege against self-incrimination. Silence is broken with equal finality by testimonial communications that are written, made orally, or expressed through conduct or actions. The Court ignores the

obvious fact that almost no one would find it acceptable to be convicted on the basis of an oral statement but unacceptable to be convicted on the basis of a written statement. By recognizing a partial invocation of the right to silence that turns solely on the form of the communication, the Court negates the values that inhere in the privilege against self incrimination.

Accordingly, when a suspect invokes the right to silence in any respect, that invocation should be deemed to apply to any and all forms of testimonial communications. Consequently, I believe defendant fully invoked his right to remain silent by writing on the bottom of the form that he did "not wish to give a statement at this time." Defendant effectively indicated that he did not wish to make a testimonial communication. Further, when defendant indicated to the police officer that he did not want to give a signed statement but would tell him what had happened, he continued to invoke his right to remain silent with respect to any form of testimonial communication.

### III

Even if I were to accept the notion of partial invocation of the right to silence, I would submit that when a suspect states initially that he or she wishes to invoke the right in part and to waive it in part, that suspect's wishes always are inherently ambiguous. Therefore, the suspect's response must be regarded, initially, as a complete invocation of the right to silence. "Any words or conduct that reasonably appear to be inconsistent with defendant's willingness to discuss his [or her] case with the police are tantamount to an invocation of the right against self incrimination." *State v. Bey* II, 112 *N.J.* 123, 136, 548 *A.*2d 887 (1988); *see also State v. Johnson*, 120 *N.J.* 263, 281, 576 *A.*2d 834 (1990) (" '[A]n equivocal indication of a desire to remain silent, like an unequivocal indication, suffices to invoke *Miranda*'s requirement that the interrogation cease.' ") (quoting *Christopher v. Florida*, 824 *F.*2d 836, 840–41 (11th Cir.1987), *cert. denied*, 484 *U.S.* 1077, 108 *S.Ct.* 1057, 98

*L.Ed.*2d 1019 (1988)); *State v. Bey* I, 112 *N.J.* 45, 64, 548 *A.*2d 846 (1988) (defendant's request to terminate questioning, "however ambiguous," must be honored); *State v. Bey* II, *supra,* 112 *N.J.* at 210, 548 *A.*2d 887 (Handler, J., dissenting) ("Even if the defendant's expression is viewed as 'ambiguous,' it must be considered an assertion of rights.").

Often, and perhaps more often than not, when a suspect indicates a desire to partially waive the right to silence, that desire will be premised on faulty assumptions about the operations of our laws and our courts. As Justice Brennan noted in *Connecticut v. Barrett,* 479 *U.S.* 523, 107 *S.Ct.* 828, 93 *L.Ed.*2d 920 (1987):

> [The] statement to police—that he would talk to them, but allow nothing in writing without counsel—created doubt about whether he actually understood that anything he *said* could be used against him. In other words, the statement is not, on its face, a knowing and intelligent waiver of the right to silence. As a general matter, I believe that this odd juxtaposition (a willingness to talk and an unwillingness to have anything preserved) militates against finding a knowing or intelligent waiver of the right to silence.
>
> [479 *U.S.* at 532–33, 107 *S.Ct.* at 834, 93 *L.Ed.*2d at 930 (Brennan, J., concurring).]

Many intelligent laypersons may erroneously believe that oral statements and promises have no legal effect. I fear that unless the bright-line rule I propose is adopted by the Court, such people may fail to realize that when they think they are invoking their right against self-incrimination they in fact are waiving it. Unless the Court recognizes that all partial waivers of the right to silence are, at least initially, inherently ambiguous, the Court may find that it has fashioned a new legal oxymoron: the ignorant, knowing waiver of Fifth Amendment rights.

I believe that when a suspect initially partially invokes the right against self-incrimination, only two avenues are open to the police. The officer may seek defendant's clarification of the apparent invocation of the right to remain silent or may terminate the interview. Because the officer necessarily will be unsure as to whether the suspect has invoked his or her right to

remain silent in its entirety, the officer may ask questions only if they are designed to clarify the suspect's intentions. *Johnson, supra,* 120 *N.J.* at 283, 576 *A.*2d 834; *State v. Wright,* 97 *N.J.* 113, 120 n. 4, 477 *A.*2d 1265 (1984) (police can inquire about the correct interpretation of an ambiguous assertion of the right to remain silent). Only by explaining that oral statements as well as written can be used to convict in a court of law would the goals of *Miranda* be met. A major purpose of the *Miranda* warnings—at least that portion noting that any oral or written statements can be used in court—is to apprise suspects of the *testimonial* effect their statements will have. When a suspect initially invokes his or her right only partially, I never would presume that the suspect has understood that portion of the warning.

## IV

In this case, the officer's testimony established that he attempted to clarify defendant's apparent invocation of the right to remain silent. He explained to defendant that he would incorporate what defendant told him into his report and that he would testify from that report in court. In essence, the officer informed defendant that whether defendant gave a written or an oral statement, the evidence would be used against him in court. That comports with the privilege against self-incrimination; it reflects the purpose of protecting against the involuntary and uninformed disclosure of testimonial communication in any form.

Following the officer's clarification, defendant made his oral statement. It was not given in response to additional questioning by the officer. Hence, to the extent defendant initially had invoked his right to remain silent, the officer's clarifying explanation without additional questioning did not breach the right to silence or violate the police officer's duty to scrupulously honor that right. The subsequent statement by defendant was volunteered, was not in response to additional interrogation,

and was made against the backdrop of adequate advice concerning the right to silence. Under the circumstances, defendant's statements were volunteered and properly admissible. *See Miranda, supra,* 384 *U.S.* at 478, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."); Wayne R. LaFave & Jerold H. Israel, 1 *Criminal Procedure* § 6.7(d), at 514 (1984) (a volunteered statement is admissible when, for example, the defendant walks into a police station and confesses or blurts out an admission; a statement may qualify as "volunteered" even though made in custody or by one who had previously asserted his right to silence).

I therefore concur in the judgment of the Court.

HANDLER, J., concurring in result.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN–7.

*For reversal*—None.