782 A.2d 941 (2001)
344 N.J. Super. 505
STATE of New Jersey, Plaintiff-Respondent,
v.
Matan SHELTON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 24, 2001.
Decided October 26, 2001.
*943 Robin Kay Lord, Trenton, argued the cause, for appellant.
Gerard C. Sims, Jr., Deputy Attorney General, argued the cause, for respondent (John J. Farmer, Jr., Attorney General, attorney; Mr. Sims, of counsel and on the brief).
Before Judges HAVEY, BRAITHWAITE and COBURN.
*942 The opinion of the court was delivered by BRAITHWAITE, J.A.D.
Following a jury trial, defendant Matan Shelton was convicted of the brutal murder of Sarah Harris ("Harris") that occurred on October 13, 1996, in Trenton. In addition to murder, N.J.S.A. 2C:11-3a(1), the jury convicted defendant of: felony murder, N.J.S.A. 2C:11-3a(3); first degree robbery, N.J.S.A. 2C:15-1; two counts of third degree theft by unlawful taking, N.J.S.A. 2C:20-3a; possession of a weapon (a scarf) for an unlawful purpose, N.J.S.A. 2C:39-4d; and unlawful possession of a weapon (a scarf), N.J.S.A. 2C:39-5d.
At sentencing following the merger of various convictions, defendant was sentenced for murder, robbery and possession of a weapon for an unlawful purpose. All the sentences on these convictions were concurrent, with defendant receiving a custodial term of life imprisonment with a thirty-year period of parole ineligibility. Defendant's convictions also resulted in violations of probations that had been imposed on two earlier convictions: third degree theft and burglary. The judge imposed consecutive five-year terms on each violation of probation, which terms were consecutive to the sentence imposed for Harris' murder. Defendant's aggregate sentence was life plus ten years, with a thirty-year parole bar.
On appeal, defendant contends:
POINT I
THE TRIAL COURT'S ADMISSION OF DEFENDANT'S STATEMENTS WAS REVERSIBLE ERROR. (PARTIALLY RAISED BELOW)
1. THE DEFENDANT WAS IMPROPERLY DETAINED [FOURTEEN] HOURS PRIOR TO MAKING ANY ALLEGED ADMISSIONS. (NOT RAISED BELOW)
2. THE WRITTEN STATEMENT MUST BE SUPPRESSED AS THE POLICE DID NOT HONOR HIS EXERCISE OF HIS RIGHT TO REMAIN SILENT. (RAISED BELOW).
POINT II
THE PROSECUTOR'S ARGUMENTS WITH RESPECT TO FINGERPRINT EVIDENCE DEPRIVED DEFENDANT OF A FAIR TRIAL. (NOT RAISED BELOW)
1. IMPROPER SPECULATION WITH RESPECT TO PRINTS FOUND.
2. IMPROPER SPECULATION WITH RESPECT TO PRINTS NOT FOUND.
POINT III
ALLOWING THE JURY TO HAVE A BLOW-UP VERSION OF DEFENDANT'S STATEMENT IN THE JURY ROOM VIOLATED DEFENDANT'S RIGHT TO A FAIR TRIAL. (RAISED BELOW)
POINT IV
THE "POSSIBLE DOUBT" LANGUAGE IN THE REASONABLE DOUBT INSTRUCTION DEPRIVED DEFENDANT OF A FAIR TRIAL. (NOT RAISED BELOW)
POINT V
*944 THE TRIAL COURT'S STATEMENT CHARGE WAS DEFICIENT. (NOT RAISED BELOW)
1. THE HAMPTON CHARGE WAS INCOMPLETE.
2. THE TRIAL COURT FAILED TO INSTRUCT ON CORROBORATION.
POINT VI
THE TRIAL COURT'S FAILURE TO GIVE A SPRUILL CHARGE WAS PLAIN ERROR. (NOT RAISED BELOW)
POINT VII
DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE.
We reject defendant's contentions and now affirm.

I
The State's proofs at trial were sufficient for a reasonable jury to find the following facts. Harris was a seventy-five-year-old woman who lived alone in the City of Trenton. On November 13,1996, defendant went to Harris' home to steal her car. Defendant wanted to sell the car and utilize the proceeds to purchase drugs. Defendant had been drinking alcohol and was high on Phencyclidine at the time. Harris and defendant were acquainted because defendant performed chores around Harris' home. Harris invited defendant into the house for a cup of tea. As a result of defendant's drug use, he was acting strangely and Harris became concerned and asked defendant to leave. Defendant told Harris that he wanted her car keys, which she refused to turn over.
Harris then attempted to telephone her husband but defendant pushed her to the floor and began to kick and beat her brutally. Because she was screaming, defendant stuffed the scarf she was wearing into her mouth to quiet her screams. After she stopped moving, defendant moved Harris' body into a pantry near the kitchen.
Defendant took Harris' car keys and the gold hoop earrings she was wearing. He then stole her car and drove it to New York City. After determining it was too late to attempt to sell the car to a "chop shop," defendant left the car in New York City and returned to Trenton by train because he was concerned about whether Harris' body had been discovered.
On November 14, the next day, defendant returned to New York City where he recovered Harris' car. He then drove the car to 123rd Street and 7th Avenue where he met Hassan Stevens. Stevens knew defendant from earlier trips defendant had taken to New York to purchase drugs. Defendant tried unsuccessfully to sell the car to Stevens and another individual for $100.
Defendant and Stevens then decided to take the car to a "chop shop" and share the proceeds. While defendant and Stevens were driving, defendant told Stevens that he had stolen the car. During the drive, defendant also wore brown working gloves and put them on every time he entered the car and took them off when he exited the car.
After visiting approximately four or five different places, defendant and Stevens were unable to sell the car. Defendant told Stevens that he could keep the car and defendant returned to Trenton by train.
Meanwhile, during the same day, Myrna Harris Taylor and Rosalyn Higganbotham, Harris' daughters, both unsuccessfully attempted to telephone their mother. While Harris lived by herself, she was visited regularly by her husband, John Harris, who lived in the area. Myrna called her father and sister, Rosalyn, to determine if *945 they knew of Harris' whereabouts. They did not know where she was. Myrna and her daughter, Yvonna, went to Harris' home to determine if there was any problem. After searching the premises, they discovered Harris' body in the pantry near the kitchen. Myrna then called the police and the rest of her family.
Harris' family informed the police that defendant, who they knew as "Blinky," had done yard work for Harris. They gave the police defendant's telephone number and the name of the street where he lived. The family did not know the exact address. Harris' family also gave police a description of Harris' car, which was missing. In turn, Detective Edgar Rios of the Trenton Police Department put out a local and national alert for Harris' car.
While the police were conducting their investigation of the murder, Stevens was driving Harris' car in New York City. As Stevens was parked, he was approached by police and a high speed chase ensued. Stevens eventually crashed the car and was captured and arrested by police. At approximately 12:40 a.m. on November 15, 1996, the New York City Police Department notified the Trenton Police Department that Harris' car had been recovered.
Officers from the Trenton Police Department and Mercer County Prosecutor's Office went immediately to New York and interviewed Stevens. Stevens told investigators that he had obtained the car from a man he knew as "Blinky," later identified as defendant. Stevens also identified defendant from an array of photographs.
The information that the Trenton Police received from Harris' family and Stevens caused Detective Scott Connor to telephone defendant's home and leave a message for him to contact the police. Detective Connor later went to defendant's home and left the same message.
At approximately 4:00 a.m. on November 15, 1996, defendant contacted the Trenton Police Department by telephone. Defendant was told that the police were investigating the murder of Harris and wanted to speak to him to determine if he had any information. At approximately 4:30 a.m., defendant voluntarily arrived at the Trenton Police Department.
Defendant was escorted to an interview room, given coffee, and asked if he could be patient until the detectives had an opportunity to speak with him. The interview room was an eight by eight room containing a square table and two chairs. The room had no windows and contained a wooden door which was closed and locked.
At approximately 5:30 a.m., Lieutenant Robert Cochran arrived at Trenton Police Headquarters and conducted a warrant check on defendant. Lieutenant Cochran uncovered an outstanding municipal warrant issued for defendant. The warrant was discovered at approximately 5:45 a.m. but was not served upon defendant because the police did not want to antagonize defendant or make him hostile until they had more information about the murder.
At approximately 6:00 a.m., Detective Connor and Captain Golden entered the interview room to speak with defendant. Defendant was advised of his Miranda[1] rights and signed a form acknowledging that he understood those rights. Defendant then waived his Miranda rights. During the reading of defendant's rights, he did not state that he wanted an attorney present nor did he indicate that he did not wish to speak to the detectives. At approximately 6:10 a.m., defendant was asked if he had information regarding the murder of Harris. Defendant responded *946 that he had no knowledge or information regarding Harris' murder. Defendant was not asked any other questions at that time, but was told that someone would be back to speak to him later. Subsequently, the two officers left and defendant remained in the interview room. Defendant was checked on periodically by officers and slept for most of the time between the initial interview at 6:00 a.m. until the second interview later that afternoon.
At 1:30 p.m., Detective Robert Tedder, one of the officers who had gone to New York to interview Stevens, returned to Trenton with Stevens. At 2:30 p.m., Detective Edgar Rios took a formal statement from Stevens.
At 3:30 p.m., Detective Tedder began his formal interview of defendant. Detective Tedder readvised defendant of his Miranda rights. Defendant chose to waive those rights and to speak to Detective Tedder. At first, defendant admitted to knowing Harris, but denied any involvement with the murder. Defendant was then confronted with the fact that the police had a witness and knowledge that defendant was in New York with Harris' car. Detective Tedder then left the interview room and returned with a photograph of Stevens and presented it to defendant. At this point, defendant replied that the fact that he had the car did not mean he had killed Harris. He said perhaps someone else killed her and he just happened to find the car on the street. At approximately 5:15 p.m., Detective Tedder decided to take a break. Defendant was given food to eat.
At 6:30 p.m. Detective Tedder resumed the interview. At this point, defendant admitted that he had killed Harris and gave a detailed account of the events of the murder. The second interview took approximately one hour and fifteen minutes and ended at approximately 8:00 p.m.
Defendant agreed to give a written statement and Detective Quinton June was directed to take the written statement. When Detective June entered the interview room, defendant stated that he did not want to give a written statement. Detective June then left the room to consult with one of his supervisors and returned to the interview room and asked defendant why he did not wish to give a written statement. Defendant told Detective June that he was confused and did not know what to do. During this time, however, defendant did not refuse to speak to Detective June, who told defendant that it was probably in his best interest to get his side of the story on paper. Defendant agreed and the written statement followed. At the completion of the written statement, defendant reviewed and signed it. During his interaction with Detective June, defendant did not ask to speak with an attorney nor did he state that he did not wish to speak to the officer. He only initially said he did not wish to give a written statement.
Dr. Raafat Ahmad, the chief medical examiner for Mercer County conducted the autopsy on Harris' body. Dr. Ahmad testified that one end of a gray scarf had been forcibly stuffed down into Harris' throat and larynx making it impossible for her to breath. There were also numerous external contusions on Harris' body indicating that Harris had been badly "beaten and gagged." In conclusion, the examiner stated that Harris' death was brought on by "massive extensive injuries to the neck, chest, head and smothering" by the scarf in her throat.
Based on the foregoing, the jury convicted defendant on all the charges. This appeal follows.

II
In point one, defendant argues that it was error to admit into evidence defendant's *947 statements because: (1) he was improperly detained for fourteen hours prior to making the statements; and (2) the written statement was inadmissible because the police did not honor defendant's exercise of his right to remain silent. We first address the admissibility of defendant's written statement.
We note that defendant's oral statements and written statement are consistent in terms of defendant confessing to the murder of Harris and the manner in which the murder was carried out. The one difference, however, is that in the oral statement, defendant said he went to Harris' house to steal her car so he could sell it to purchase drugs. In his written statement he said he went to Harris' home to perform chores like he had done on past occasions.
We agree with defendant that his written statement was improperly admitted into evidence. When Detective June entered the interview room, defendant said he did not wish to give a written statement. Detective June then left the room and sought advice from a supervisor. He returned to continue the interview and asked defendant why he did not wish to give a written statement. Defendant said he was confused and did not know what to do, yet continued to discuss orally the details of Harris' murder.
Defendant invoked his right not to provide a written statement to the police. "[A] defendant can invoke Fifth Amendment protection against self-incrimination for a limited purpose, and ... statements [made] outside the scope of that invocation are admissible." State v. Adams, 127 N.J. 438, 446, 605 A.2d 1097 (citing Connecticut v. Barrett, 479 U.S. 523, 529, 107 S.Ct. 828, 832, 93 L.Ed.2d 920, 928 (1987)). Here, defendant's invocation of the right not to give a written statement had to be "scrupulously honored" by the police.
State v. Hartley, 103 N.J. 252, 261, 511 A.2d 80 (1986). That was not done here.
The motion judge, following defendant's Miranda hearing, concluded that Detective June was permitted to return to the interview room and "clarify" defendant's intention because earlier defendant had said that he would give a written statement. We are satisfied that under the circumstances here, there was no need for any clarification. There was no equivocation on defendant's part that would justify Detective June being reasonably unsure that defendant asserted his right not to give a written statement so as to support questions designed to clarify whether defendant invoked that right. See State v. Johnson, 120 N.J. 263, 283, 576 A.2d 834 (1990).
Moreover, Detective June, faced with defendant's remarks that he did not wish to make a written statement, could not properly say to defendant that it was "probably in [defendant's] best interest to get his side of the story on paper at this time." Detective June's remarks cannot be construed as scrupulously honoring defendant's right not to give a written statement. Before Detective June could have taken a written statement from defendant, a set of "fresh Miranda warnings" would have to be administered. Hartley, supra, 103 N.J. at 267, 511 A.2d 80. That was not done here. The motion judge erred in not suppressing defendant's written statement confessing to Harris' murder.
We next address the admissibility of defendant's oral statements. He made oral statements to Detectives Tedder and June. Defendant raises for the first time on appeal that he was illegally detained and his oral confessions were a product of that illegal detention. Defendant must establish that any error here had the clear capacity to produce an unjust result.
*948 State v. Bey, 112 N.J. 45, 63, 548 A.2d 846 (1988); R. 2:10-2. We are satisfied that no such error occurred. The motion judge concluded correctly that defendant was under arrest from approximately 5:45 a.m. on November 15, 1996. At that hour the police had an outstanding municipal warrant for defendant's arrest. Furthermore, the police were conducting the investigation of Harris' murder and had information that defendant had been in New York with Harris' car. Moreover, the police were interviewing Stevens in New York who told police that defendant had given Stevens the car.
We are satisfied that prior to defendant's oral confessions, the police had probable cause to arrest defendant for Harris' murder. The police had evidence that defendant knew Harris, possessed her car with the keys in New York, admitted to stealing the car and "gave" the car to Stevens when it could not be sold. The police had a statement from Stevens in which he had positively identified defendant as the person who had given him the car. Further, defendant was given his Miranda warnings, which he voluntarily waived prior to his oral confessions. We are satisfied that defendant's oral confessions were not the product of an illegal detention.
As noted above, the fact that defendant's written statement was inadmissible, does not render the oral statements inadmissible provided that they were "made `voluntarily, knowingly and intelligently.' " Adams, supra, 127 N.J. at 447, 605 A.2d 1097 (quoting Miranda supra, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707). The State bears the burden of establishing waiver beyond a reasonable doubt. State v. Gerald, 113 N.J. 40, 118, 549 A.2d 792 (1988). Here, the motion judge found that with respect to the oral statements, the State met its burden. That finding is supported by sufficient credible evidence in the record. See State v. Locurto, 157 N.J. 463, 470-71, 724 A.2d 234 (1999); State v. Johnson, 42 N.J. 146, 161-62, 199 A.2d 809 (1964). We therefore conclude that defendant's oral confessions were properly admitted into evidence.
We must now address the impact of the improperly admitted written statement on defendant's conviction and whether it warrants reversal and a new trial or whether the error was harmless. In this connection, we consider defendant's third point on appeal that "allowing the jury to have a blown up version" of defendant's written confession during deliberations was reversible error. Allowing any version of the written statement, "blown up" or otherwise, constituted error because the written statement was inadmissible.
We conclude, however, that the error was harmless given the evidence of defendant's guilt. Here, defendant gave oral confessions to both Detectives Tedder and June. He only balked at giving a written statement to Detective June. Further, both the oral and written statements were the same in terms of inculpating defendant in the murder. In addition, there was the testimony from Stevens, who drove around with defendant in Harris' car in an attempt to sell it. During this time, defendant kept gloves on his hands while he was in the car and removed them when he exited the car. Defendant admitted to Stevens that he had stolen the car. Despite evidence that defendant may have been able to steal cars in other ways, he had the key to Harris' car. It was Harris' refusal to give defendant her car keys that led to his rage and brutal beating of Harris which resulted in her death.
Moreover, although the presence of the blown-up written confession in the jury *949 room during deliberations was error here, we fail to see what the jury learned from the document that it did not already know from defendant's properly admitted oral confessions. "[T]he jury here `learned no more from the improperly admitted confession than it did from the properly admitted one,' since the oral and written confessions set forth essentially the same story." U.S. v. Johnson, 816 F.2d 918, 923 (3d Cir.1987) (quoting Bryant v. Vose, 785 F.2d 364, 367 (1st Cir.1986)). We conclude that the admission of the written statement was not "clearly capable of producing an unjust result." R. 2:10-2.

III
As to the remaining points raised by defendant, our careful review of the record convinces us that they do not warrant a lengthy discussion in a written opinion. R. 2:11-3(e)(2). We, however, add the following comments.
For the first time on appeal, defendant challenges the prosecutor's remarks in summation regarding fingerprint evidence. He argues that the comments exceeded the bounds of propriety and thereby denied him a fair trial. We disagree. We do not read the prosecutor's remarks as suggesting that defendant's fingerprints were found, but that they were unsuitable for comparison. She simply referred to the detective's testimony that fingerprints were found but were too smudged to be usable. What was clear from the comments was that none of defendant's fingerprints were found. The prosecutor's remarks were supported by the evidence and the reasonable inference from that evidence.
Moreover, the prosecutor's remarks were in response to defense counsel's summation that emphasized the lack of physical evidence, including fingerprints, connecting defendant to the crime. A prosecutor is afforded considerable latitude in making opening and closing statements. State v. DiFrisco, 137 N.J. 434, 474, 645 A.2d 734 (1994); cert. denied, 516 U.S. 1129, 116 S.Ct. 949, 133 L.Ed.2d 873 (1996). The prosecutor's comments were not "clearly capable of producing an unjust result." R. 2:10-2.
The reasonable doubt charge was consistent with the holding of our Supreme Court in State v. Medina, 147 N.J. 43, 685 A.2d 1242 (1996), cert. denied, 520 U.S. 1190, 117 S.Ct. 1476, 137 L.Ed.2d 688 (1997). Defendant has failed to demonstrate that error, plain or otherwise, occurred in this regard.
We also conclude that the judge's charge pursuant to State v. Hampton, 61 N.J. 250, 294 A.2d 23 (1972), was adequate. Again, no error "clearly capable of producing an unjust result" happened in this context. R. 2:10-2.
Defendant also asserts as plain error the judge's failure to, sua sponte, issue a charge pursuant to State v. Spruill, 16 N.J. 73, 106 A.2d 278 (1954). A defendant is entitled to request a charge that counsels the jury to carefully scrutinize and assess the evidence provided by an accomplice in light of the accomplice's special interest in the case. Id. at 80, 106 A.2d 278. Further, a judge may give a Spruill charge sua sponte if he or she thinks it is advisable under the circumstances. State v. Artis, 57 N.J. 24, 33, 269 A.2d 1 (1970). It is, however, "generally not wise to give such a charge absent a request because of possible prejudice to defendant." Ibid. Clearly "it is not error, let alone plain error, for a trial judge to fail to give this cautionary comment where it has not been requested." Ibid.
Finally, defendant argues that his sentence is excessive. Defendant's contention is that the sentences on the two violations of probation should have been concurrent with each other and concurrent with the sentence imposed on the murder *950 conviction. Further, defendant asserts that the sentences on the violations of probation should have been for the presumptive term of four years.
Our careful review of the record convinces us that there is no basis to disturb the sentence imposed on defendant for his violations of probation. The sentence is not manifestly excessive or unduly punitive and does not constitute an abuse of discretion. State v. O'Donnell, 117 N.J. 210, 215-16, 564 A.2d 1202 (1989); State v. Ghertler, 114 N.J. 383, 387-88, 555 A.2d 553 (1989); State v. Baylass, 114 N.J. 169, 175, 553 A.2d 326 (1989); and State v. Roth, 95 N.J. 334, 365-66, 471 A.2d 370 (1984). Finally, in this regard, we are satisfied that the judge applied correctly the guidelines for imposing consecutive sentences with respect to defendant's violations of probation. State v. Yarbough, 100 N.J. 627, 643-44, 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986); see also N.J.S.A. 2C:44-5a.
Affirmed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).