# RECORD IMPOUNDED

### NOT FOR PUBLICATION WITHOUT THE
### APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4224-15T1

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

DERRICK FREDERICK,

      Defendant-Appellant.

_____

Argued September 26, 2018 – Decided January 22, 2019

Before Judges Fuentes, Accurso and Moynihan.

On appeal from Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 13-05-1281.

Cody T. Mason, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Cody T. Mason of counsel and on the brief).

Roberta Di Biase, Supervising Assistant Prosecutor, argued the cause for respondent (Joseph D. Coronato, Ocean County Prosecutor, attorney; Samuel J. Marzarella, Chief Appellate Attorney, of counsel; Roberta Di Biase, on the brief).

PER CURIAM

Defendant Derrick Frederick appeals from judgments of conviction entered after two severed jury trials. Defendant was convicted in the first trial – relating to an incident involving the victim, L.H., in Aberdeen – of fourth-degree criminal trespass, N.J.S.A. 2C:18-3(a), and fourth-degree attempted criminal sexual contact, N.J.S.A. 2C:5-1; N.J.S.A. 2C:14-3(b), as lesser included offenses: second-degree burglary, N.J.S.A. 2C:18-2 (count one)[1] and second-degree attempted aggravated sexual assault, N.J.S.A. 2C:5-1; N.J.S.A. 2C:14-2(a)(3) (count two). In the second trial – relating to an incident involving the victim, E.R., in Matawan – defendant was convicted of: second-degree burglary, N.J.S.A. 2C:18-2 (count three); first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(3) (count four); and third-degree criminal restraint, N.J.S.A. 2C:13-2(a) (count five).

Defendant raises the following arguments in this appeal:

> POINT I
>
> FREDERICK'S STATEMENTS SHOULD BE SUPPRESSED AND HIS CONVICTIONS REVERSED BECAUSE THE POLICE DID NOT SEEK CLARIFICATION OR STOP THE FIRST

---

[1] The numbered counts refer to those in the original indictment. The numbers were changed on each trial's verdict sheet.

INTERROGATION WHEN HE DISCUSSED SEEKING COUNSEL.

A. THE POLICE WERE REQUIRED TO STOP THE FIRST INTERROGATION OR SEEK CLARIFICATION AFTER FREDERICK MENTIONED SEEKING COUNSEL.

B. FREDERICK'S STATEMENTS FROM THE SECOND INTERROGATION SHOULD HAVE BEEN SUPPRESSED BECAUSE THE TAINT FROM THE FIRST INTERROGATION WAS NOT ATTENUATED.

C. THE CONVICTIONS MUST BE REVERSED BECAUSE THE INADMISSIBLE STATEMENTS WERE USED TO ATTACK FREDERICK'S CREDIBILITY IN BOTH TRIALS.

POINT II

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED EVIDENCE, WITHOUT LIMITING INSTRUCTIONS, THAT THERE WERE MULTIPLE ALLEGED VICTIMS, THAT FREDERICK WAS SUSPECTED IN OTHER BURGLARIES, THAT FREDERICK HAD PEERED THROUGH APARTMENT WINDOWS, AND THAT FREDERICK HAD POSSIBLE SEXUAL COMPULSIONS.

A. THE EVIDENCE OF FREDERICK'S ALLEGED BAD ACTS, CRIMES, AND SEXUAL COMPULSIONS WAS IRRELEVANT AND HIGHLY PREJUDICIAL, SUCH THAT ITS ADMISSION REQUIRES REVERSAL.

B. EVEN IF THE EVIDENCE WAS ADMISSIBLE, THE COURT COMMITTED REVERSIBLE ERROR IN NOT PROVIDING PROPER LIMITING INSTRUCTIONS.

POINT III

THE PROSECUTOR ENGAGED IN MISCONDUCT AMOUNTING TO PLAIN ERROR, INCLUDING WHEN HE ATTACKED FREDERICK WITH HIS INFIDELITY, ACCUSED THE DEFENSE OF BEING PREJUDICED, AND APPEALED TO THE JURY'S PASSIONS ON THE ISSUE OF SEXUAL ASSAULT.

A. THE PROSECUTOR ENGAGED IN MISCONDUCT WHEN HE ATTACKED FREDERICK'S CREDIBILITY WITH HIS INFIDELITY, VOUCHED FOR L.H., AND PLAYED TO THE JURY'S PASSIONS DURING THE ABERDEEN TRIAL.

B. THE PROSECUTOR ENGAGED IN MISCONDUCT WHEN HE WRONGLY ASSERTED THAT FREDERICK LIED, AND PLAYED TO THE JURY'S PASSIONS AND UNDULY DISPARAGED THE DEFENSE REGARDING ALLEGED ANIMUS AND SEXUAL ASSAULT ISSUES DURING THE MATAWAN TRIAL.

POINT IV

THE CUMULATIVE EFFECT OF THE TRIAL ERRORS DEPRIVED FREDERICK OF A FAIR TRIAL IN BOTH CASES AND WARRANTS REVERAL OF HIS CONVICTIONS.

POINT V

A REMAND IS REQUIRED BECAUSE THE COURT ERRONEOUSLY FOUND AGGRAVATING FACTOR ONE, RESTRAINED FREDERICK'S ALLOCUTION, DID NOT PROPERLY CALCULATE HIS JAIL CREDIT, DID NOT MERGE THE SEXUAL ASSAULT AND BURGLARY CONVICTIONS, AND DID NOT EXPLAIN THE $2000 N.J.S.A. 2C:14-10 FINE IMPOSED.

A.   A REMAND IS REQUIRED BECAUSE THE COURT IMPROPERLY FOUND AGGRAVATING FACTOR ONE, DID NOT AFFORD A FULL OPPORTUNITY TO ALLOCUTE, AND WITHHELD A DAY OF EARNED JAIL CREDIT.

B.   A REMAND IS REQUIRED BECAUSE THE COURT ERRED IN NOT MERGING FREDERICK'S AGGRAVATED SEXUAL ASSAULT AND BURGLARY CONVICTIONS.

C.   A REMAND IS REQUIRED BECAUSE THE COURT DID NOT EXPLAIN THE $2000 N.J.S.A. 2C:14-10 PENALTY IMPOSED.

We reject these arguments and affirm defendant's convictions in both trials.  We further affirm in part defendant's sentence arising from the Matawan trial, but remand to the trial court to reassess the Sex Crimes Victim Treatment Fund (SCVTF) penalty amount, N.J.S.A. 2C:14-10, and award defendant one day of jail credit. See R. 3:21-8.

# I

Defendant contends the trial court erred in denying his motion to suppress both statements he gave to the police "because the detectives continued to interrogate him after he discussed consulting an attorney during the first [custodial] interrogation" and his second statement was tainted by the detectives' failure to seek clarification or stop questioning after he invoked the right to counsel.

A trial court's decision on a motion to suppress requires our deference to the court's factual findings so long as they "are supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424 (2014). The deferential standard applies to factual findings based on a video-recorded statement. State v. S.S., 229 N.J. 360, 379 (2017). "[T]he task of appellate courts generally is limited to reviewing issues of law. Because legal issues do not implicate the fact-finding expertise of the trial courts, appellate courts construe the Constitution, statutes, and common law 'de novo – "with fresh eyes . . . ."'" Id. at 380 (quoting State v. Morrison, 227 N.J. 295, 308 (2016)). We need not defer to a trial judge's interpretive conclusions "unless persuaded by their reasoning." Morrison, 227 N.J. at 308.

Although the trial court did not address whether defendant was in custody, it did find the first statement was voluntarily and knowingly made after

6

defendant acknowledged he understood the Miranda[2] warnings administered by the detectives. We defer to the court's conclusion based on its findings that the conversation during the first interview was cordial and defendant's will was not overborne, all of which are supported by the record.

The record also supports the trial court's finding that defendant "never said he didn't want to talk," and that when he "said that he had an attorney back home . . . in the [United States] Virgin Islands" it was "very clear to the [c]ourt . . . the [d]efendant's reference to an attorney did not extend beyond the desire to talk to his attorney about giving a DNA sample. Under no circumstances did he say or suggest that he wanted to talk to an attorney before speaking further."

About halfway through the interview, and just before defendant told the detectives about his arrest and conviction for criminal activity in the Virgin Islands and that he "chang[ed] everything" after coming to the United States, the detectives told defendant that they recovered DNA evidence from the crime scene. They presented defendant with a consent form for his DNA sample and asked, "Is that something that you would be willing to give us so that we can drop this issue and rule you out and never have to bother you again?" Defendant replied, "Okay, I have no problem with it," but added his DNA and fingerprints

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

were "supposed to be on file" in the Virgin Islands due to his "three or four" arrests and conviction. When defendant told the detectives that he would contact them and "cooperate with everything" if they wanted "samples, fingerprints, anything you need," the detectives explained the DNA process and why they thought it would be "better" if defendant gave a new sample instead of obtaining records from the Virgin Islands. Defendant tried to assure the detectives of the accuracy of his Virgin Islands records, saying:

> No, but that's one thing we did, verified before I even left the island (inaudible) sit, I have to report for that situation. But it is everything accurate on my record. I would have to speak to my attorney –
>
> [Detective]: Okay.
>
> [Defendant]: – before I give you this. All right? You want to know (inaudible) place. You understand? Being that you could get held of my records from my old cases, or I speak to my attorney, I contact you guys, I come down to the detective and –
>
> [Detective]: Okay.
>
> [Defendant]: – do it.
>
> [Detective]: That's fine.

The other half of the thirty-seven minute interview then continued without defendant's mention of or request for an attorney.

We agree with the trial judge's record-supported determination that defendant did not invoke his right to counsel by saying that he would have to speak to his attorney – who was in the Virgin Islands – before allowing the detectives to obtain his Virgin Islands records.[3] The statements, in context, cannot be viewed as an assertion – clear or ambiguous – of his right to counsel in connection with the detectives' questioning. See State v. Wright, 97 N.J. 113, 120 (1984) (holding if a suspect's request is unclear, officers are "under an obligation to clarify the meaning of defendant's remark before proceeding with further questioning"); State v. Adams, 127 N.J. 438, 447-48 (1992) (requiring trial courts to examine the totality of the circumstances in determining if the State proved a defendant's waiver of Fifth Amendment Miranda rights).

If an invocation at all, it was a limited invocation pertaining only to the DNA sample. In Adams, our Supreme Court concluded a defendant's decision, "expressed with no ambiguity whatsoever," after administration of Miranda warnings, not to give a written statement was not an invocation of his right to remain silent as to an oral statement. Adams, 127 N.J. at 448-49. The Court

---

[3] We reject defendant's attempt to link the trial court's early observation that defendant may be difficult to understand to the State's alleged failure to establish that his comments about an attorney related to the DNA sample. The trial court, as evidenced by its findings of fact after listening to both statements, gave no indication that it could not understand defendant.

has also ruled a defendant's declaration that he would tell the police "anything [they] want to know," but would not give a recorded statement without counsel present, to be a limited invocation of rights that did not prevent the police from obtaining his unrecorded statement without counsel present. State v. Gerald, 113 N.J. 40, 115-16, 118-19 (1988). Although we determine defendant did not even equivocally invoke his right to counsel during the first interview, if he did it was clearly related to obtaining DNA records from the Virgin Islands, not to the continued questioning. When defendant was asked to provide a DNA sample toward the end of the two-hour second police-interview, he more clearly stated that he would "have to speak to [his] attorney first." As the trial court found, he confirmed that his prior statement about speaking to counsel pertained only to the request for his DNA sample, and he was willing to continue to talk to the police. The trial court did not err in denying defendant's motion to suppress his first statement.

Inasmuch as the first statement was not infirm, we find no merit in defendant's contention that the taint from the detectives' failure to honor his right to counsel during the first interview "carried over to the second interrogation . . . such that the resulting statements should have also been suppressed." As such, we need not address whether any taint was attenuated by the passage of

five weeks between the first and second statements, during which time defendant was not incarcerated.

We determine defendant's argument that the inadmissible statements were improperly used to attack his credibility at trial to be without sufficient merit to warrant discussion in this written opinion. R. 2:11-3(e)(2). Not only were both statements admissible, they could be used to impeach defendant's credibility even if taken in violation of defendant's Miranda rights. Oregon v. Hass, 420 U.S. 714 (1975); Harris v. New York, 401 U.S. 222 (1971); State v. Burris, 145 N.J. 509, 533-36 (1996).

## II

Defendant argues the trial court erred when it failed to exclude bad-acts evidence concerning: other burglaries and peering into apartment windows; defendant's sexual compulsion; and the crimes charged in the severed indictment. "[E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith." N.J.R.E. 404(b). "Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan,

11

knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute."[4]  Ibid.

"[A] trial court's evidentiary rulings are 'entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).  "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling "was so wide of the mark that a manifest denial of justice resulted."'" Ibid. (quoting Marrero, 148 N.J. at 484).

Defendant also contends that prosecutorial misconduct at each trial, although not objected to, amounted to plain error because the prosecutor's comments during each summation were clearly capable of producing an unjust result.  R. 2:10-2.  We review defendant's contentions separately for each trial.

A.  The Aberdeen Trial

---

[4]  Before evidence can be admitted under Rule 404(b), the proponent must establish: 1) the evidence of the other crime must be admissible as relevant to a material issue; 2) it must be similar in kind and reasonably close in time to the offense charged; 3) the evidence of the other crime must be clear and convincing; and 4) the probative value of the evidence must not be outweighed by its apparent prejudice.  N.J.R.E. 404(b); State v. Cofield, 127 N.J. 328, 338 (1992).  The trial court was not asked to, nor did it undertake, this analysis.

Defendant lodged no objection to any of the bad-acts evidence during the first trial involving the Aberdeen crimes alleged in the first and second counts of the indictment. A trial court's error in admitting testimony "to which there was no objection" is subject to reversal only if there was plain error, that is "error 'clearly capable of producing an unjust result.'" State v. Branch, 182 N.J. 338, 353 (2005) (quoting Rule 2:10-2). If error is found, "we must consider whether there is reasonable doubt that the jury would have ruled other than as it did." Ibid. (quoting State v. Irving, 114 N.J. 427, 447 (1989)).

Defendant claims evidence was admitted linking him to other burglaries and to peering into windows at an apartment complex, and that the assistant prosecutor mentioned same in his opening statement. In his opening, the assistant prosecutor told the jury the Aberdeen detective assigned to the case was informed by a detective in neighboring Matawan, where defendant resided, that he spoke to defendant "generally about [defendant's] knowledge about burglaries that were going on in the area." The assistant prosecutor continued, although they did not detain defendant because the police "had nothing to hold him . . . they felt very strongly he was a suspect."

The Aberdeen detective's testimony related that Matawan detectives informed him that they received a "suspicious call involving [defendant]," who

A-4224-15T1

was subsequently stopped "in a nearby [apartment] complex . . . at [four or five] in the morning." As a result of that stop, defendant became a suspect in the Aberdeen case. The Aberdeen detective then related that, as part of a joint investigation he and the Matawan detective conducted, they interviewed defendant and asked him about unsolved burglaries in the area. Although defendant denied involvement in those crimes, the Aberdeen detective still considered "defendant to be a person of interest in the investigation."

The Matawan detective testified that the joint investigation – a common practice that he said occurred "all the time" between the two towns – involved the Aberdeen incident, not the other unsolved burglaries. He also related that a Matawan officer, dispatched to an area on a report of "a black male subject" who was peering in apartment windows, stopped defendant. Based on the stop, the Matawan detective said he advised the Aberdeen detective that defendant was a potential suspect and interviewed defendant "generally if he had any information about burglaries that were reported in the Matawan, Aberdeen area." After defendant denied any knowledge of those incidents, the Matawan detective said defendant was not detained because the police "didn't have information to hold him." The detective still considered defendant to be a "person of interest"

14

causing the police to surveil defendant. That surveillance led to the discovery of DNA evidence linking defendant to the Aberdeen crimes.

When viewed in the context of the entire trial, the State never sought to link the evidence of other burglaries and the peering to defendant. That evidence only explained how defendant was developed as a suspect in the Aberdeen case. Any possible taint from the Matawan officer's stop of defendant after he was observed, as the assistant prosecutor described, "doing suspicious activity," or the questioning of defendant about other burglaries was buffered by the detectives' acknowledgement that no evidence linked defendant to any other crime. Nor was there any mention of the severed Matawan sexual assault. The Matawan detective's testimony about common joint investigations, and that this investigation involved only the Aberdeen incident, made clear that defendant had no connection to any other incident.

Defendant also alleges error in the admission of portions of his second statement in which the police referenced sexual attacks against two women – not just the Aberdeen victim – and also asserted defendant had a sexual compulsive disorder that led him to commit the crimes. We note that the statement underwent substantial redactions after the trial court severed the cases. Defense counsel reviewed the redacted video statement and transcript, also

referred to as a listening aid for the jury, and posed no objection to the final, redacted version.

There are two sections of the statement in which the Aberdeen detective references not only L.H. but another woman:

> Yeah, she stabbed you with a knife and we have your blood off that knife and that knife is – gives us a complete profile of your, of your DNA. So if you need help, bro, it's okay, talk to us about it, but these two girls here, you didn't know them. You don't know their names. You know everybody else that you're banging, but you don't know their names. Right? You have a problem you need help with? This is America. I don't know what it's like in the U.S. Virgin Islands, 'ya know. Nobody's judging you, but if you need help, just say it.
>
> But my point is you didn't know the girl. You went there. Admit you have a problem. And you need to work on it. You're 32 years old. You could turn your life around still, but don't bullshit us and tell us that you know these people 'cause you didn't know these people. You may have seen them in passing, but they didn't invite you in because what do you think we're gonna do now, we're going to bring them in and say, oh, you meet this guy at 7-Eleven, do you know this guy? And they're gonna say, hell, no, I don't know the guy. You're beat anyways, so you might as well just tell us exactly what happened and maybe we can get you some help. Because these girls are gonna tell us they don't know you from Adam.
>
> [(emphasis added).]

16

These two brief references are intermingled with colloquy at the end of a long statement during which all of the other many references were to the Aberdeen victim alone. The State made no reference to other victims, including the victim of the crimes charged in the severed counts, at any other time during the trial.

The foregoing excerpts from defendant's second statement contain some of the complained-of references to defendant's sexual compulsive disorder – his so-called "problem." Defendant cites to three other sections:

> – and she says I never had a talk, I never had a conversation with anybody about coming to my house and having a massage. I would bet everything I own that's what she's going to tell me. Let's get off this nonsense. Let's talk about what your problem is. You can't – you're not going to get better unless you admit to your problem. This girl didn't have you come over to her house for a massage. You may have seen her at 7-Eleven, you may have seen her where she lives, but you didn't talk to her. You didn't. And maybe you have a split personality, I don't know. I'm no doctor. But go to, go to be there and tell me, tell me the truth. You don't know this girl. This girl surely didn't invite you to her house. You know it, I know it, She knows it and God knows it. How you gonna get better if you don't just come clean with yourself?
>
> Have we not – have we not treated you like – I'm, I'm talking to you. I want to see you get better, man. I feel bad that you got yourself in this thing, man, but you got a demon that you're struggling with and you need, you need to come clean on it.

It's okay, dude, but you, you know you want to get better. You know you don't want to do this. You know you don't want to hurt nobody. You have a mom. You have sisters? . . . You have sisters. I know you don't want to hurt nobody. But how you gonna change if you can't come clean on your problem? You got a problem.

In summation – ahead of the court's instruction that the jury's assessment of the credibility of defendant's statement should include the circumstances and facts as to how the statement was made – defense counsel argued the detectives did not explore any theories other than that defendant was guilty and that they lied to him during the interviews in order to elicit a confession. The Aberdeen detective's remarks about defendant's "problem" can only be viewed as part of his efforts to get defendant to "come clean" and admit to the crime. The comments were designed to convince defendant he should admit to the crimes in order to avail himself of mental health treatment. They were obviously not a diagnosis of defendant. Nor did the detective suggest or prove any evidence that there was a source for his comments;[5] they were attributable only to the investigative technique he employed.

---

[5] In his statement, defendant admitted he tried to get mental health assistance in the Virgin Islands and that he sometimes heard voices. He also mentioned he was going to see a psychiatrist. These portions of the statement were redacted before presentation to the jury.

Defendant also claims the State elicited testimony from his then-girlfriend, "over defense counsel's objection, that she broke up with [defendant] because 'a lot of things had come about, a lot of questions were coming up' and she 'started noticing behaviors about him that made [her] feel differently about him.'" That testimony was actually elicited by the State in response to defense counsel's cross-examination query if the girlfriend thought defendant "was great with [the girlfriend's] kids" and if she "thought he was very kind and a good person." The defense, as the trial court suggested, elicited improper character evidence from the girlfriend. After the testimony was elicited by the State, defense counsel did not object; she requested a sidebar conference at which the court fostered the development of follow-up questioning to which defendant did not object:

> [ASSISTANT PROSECUTOR]: Ma'am, you were asked on cross-examination your . . . opinion of the [d]efendant at the time you were dating him and you offered an opinion that he was nice to you, he was nice to your kids. Do you recall that?
>
> [GIRLFRIEND]: Yes.
>
> [ASSISTANT PROSECUTOR]: Now, since that time, has your opinion about the [d]efendant . . . that he was a good, decent man, has that changed?
>
> [GIRLFRIEND]: Yes.

[ASSISTANT PROSECUTOR]: Has it changed in the favorable way or a disfavorable way?

[GIRLFRIEND]: Disfavorable.

Defendant's own theory of the case was that he engaged in an affair with L.H. although he was in a relationship with his girlfriend, and that L.H. cut short a tryst with him because she thought her boyfriend would discover her affair with defendant. Indeed, defendant responded affirmatively to his counsel's questions on direct examination that he was still in a relationship with his girlfriend when he started a relationship with L.H. and that "this interaction with [L.H. was] not something that [he] would have wanted [the girlfriend] to know about." No objection was made when the assistant prosecutor asked defendant on cross-examination if he deceived the girlfriend "into thinking that she was in an exclusive relationship"; defendant answered, "yes."

Infidelity permeated the trial. As defense counsel said of both defendant and L.H. in summation, "Well, they're both cheating, [they] are both cheating, I guess, and isn't that kind of what you do[] if you're having an affair; right? Again, we're all adults." Later in summation, defense counsel acknowledged defendant was in a dating relationship with the girlfriend who

> thought they were in a very monogamous relationship, that they weren't seeing other people. She liked him enormously, he was good

around her kids, he took them to the pool, and I think it was very clear that when she found out that he was not faithful, that that relationship was ended and it ended most likely on a sour note. Again, not a crime that we settle in this court.

While none of this testimony or attorney comment should have been permitted, see N.J.R.E. 405(a); N.J.R.E. 608(a); State v. Parker, 216 N.J. 408, 418-19 (2014); State v. Mondrosch, 108 N.J. Super. 1, 4-5 (App. Div. 1969) (holding the disposition of a person may not be proved by specific instances of conduct), the girlfriend never linked defendant's behavior that made her "feel differently" about him or caused the change in her opinion of him, to any criminal conduct or other bad acts.

We are not persuaded by defendant's arguments – at times, freighting the trial evidence with contrived meaning – that the admission of "[i]rrelevant and [h]ighly [p]rejudicial" evidence requires reversal. Most of the evidence was benign. Other evidence that may have been construed in a vacuum to be prejudicial was explained away, or at least moderated, by other evidence or the circumstances of the case. As to any evidence that was unrelated to the Aberdeen case, the judge instructed the jury to consider only evidence that was relevant and material to the charged crimes.

21

Under the plain error standard, no error in the context of the entire trial – either in the admission of evidence about the unrelated burglaries and peering, the police accusation of defendant's sexual compulsions, portions of defendant's statements indicating there were other victims of sexual assault or the assistant prosecutor's elicitation of defendant's infidelity and his comments thereon – was clearly capable of producing an unjust result warranting reversal.

We look askance at the assistant prosecutor's closing remarks after he appropriately told the jury that defendant took the stand and admitted lying to the police:

> Who else did he lie to? He lied to the woman that he was involved with. He had a serious relationship, he knew her children. She even said, when asked by [defense counsel], what did you think of the defendant? And she said, when I was dating him, I thought he was a nice guy. Well, we know her opinion has since changed once she got to know the real [defendant]. But he's apparently not only a liar but a pretty darn good one, because he was able to convince this woman who is a nurse, a professional, who had children, that he was a good enough guy to be invited into her home, be around her children and all the time he was running around and doing God only knows what else. So he's a good liar. So he got on the stand, he told you he's a liar, we know from [the girlfriend] . . . that he's a very good liar. So we have a story from a good liar that, hey, it could happen.

The assistant prosecutor's statement was based on evidence that should not have been admitted. But, not surprisingly in light of defendant's admissions that he was having an affair with L.H. and the injection of the girlfriend's character evidence by the defense, no objection was made by the defense. Defendant's failure to make a timely objection to a prosecutor's improper comment, "indicates that in the atmosphere of the trial the defense did not believe that the prosecutor's remarks were prejudicial." State v. Wilson, 57 N.J. 39, 51 (1970). In the context of the entire record, evidence of defendant's infidelity and the assistant prosecutor's comments thereon was not "so egregious that it deprived defendant of a fair trial." State v. DiFrisco, 137 N.J. 434, 474 (1994) (quoting State v. Pennington, 119 N.J. 547, 565 (1990)). As we recognized in State v. Murray, 338 N.J. Super. 80, 87-88 (App. Div. 2001):

> "To justify reversal, the prosecutor's conduct must have been 'clearly and unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." The failure to make a timely objection not only indicates the defense did not believe the remarks were prejudicial at the time they were made, but also deprives the judge of the opportunity to take the appropriate curative action. In addition, in reviewing a prosecutor's summation, we must consider the context in which the challenged portions were made, including determining whether the remarks were a measured

> response to defendant's summation made in an attempt to "right the scale."
>
> [(citations omitted).]

Defendant was extensively cross-examined about numerous inconsistencies in his statements to the police which were far more germane to the case; he admitted he lied to the police five times during his second statement.

We are not persuaded by defendant's argument that the assistant prosecutor vouched for L.H.'s credibility. The assistant prosecutor's comments challenged by defendant about L.H.'s modesty, strong fight or flight response, and her bravery were not at all related to her credibility. Even if the assistant prosecutor did support L.H.'s credibility, it was in response to a direct attack by defense counsel in summation: "I'll come right out and say it, she is a liar"; "[t]here are lies and then there are travesties of injustice lies." "A prosecutor may not express a personal belief or opinion as to the truthfulness of his or her witness's testimony." State v. Staples, 263 N.J. Super. 602, 605 (1993). It is permissible, however, to "argue that a witness is credible, so long as the prosecutor does not personally vouch for the witness or refer to matters outside the record as support for the witness's credibility." State v. Walden, 370 N.J. Super. 549, 560 (App. Div. 2004). At worst, that is what the assistant prosecutor did here. Contrary to defendant's arguments, the comments were not likely to

24

"arouse sympathy for [L.H.] with the jury" because the prosecutor tied them to the evidence and drew reasonable inferences therefrom. The assistant prosecutor's comments were not clearly and unmistakably improper; nor did they substantially prejudice defendant's right to have the jury fairly evaluate the merits of his defense.

Under the plain error standard of review, the alleged error here was not "sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached." State v. Daniels, 182 N.J. 80, 95 (2004) (alteration in original) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). "The mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016) (citing State v. Jordan, 147 N.J. 409, 422 (1997)). Reversal is not warranted.

### B. The Matawan Trial

Defendant's reprised arguments regarding the admission of evidence regarding the Matawan officer's stop after receiving a call about someone peering in windows and the detectives' questioning of defendant about burglaries in Matawan and Aberdeen lead to the same result as in the Aberdeen trial, albeit after considering some additional evidence.

The assistant prosecutor, in his opening statement, said the police investigation of defendant began when the Matawan officer approached the Matawan detective and told him, a week prior he "went out on [a] suspicious person call" and "didn't see anyone except [defendant]." The assistant prosecutor related the detective then interviewed defendant and "asked him if he knew anything about the burglaries in the area. [Defendant] denied any knowledge and they let him go."

The officer testified that he responded at approximately 10:00 p.m. to the call of a "suspicious suspect walking behind the apartment buildings, possibly looking into the windows of the cars and/or apartments." He searched the area and found defendant walking away from the apartment complex area. The officer said defendant explained that he was looking for a stolen bicycle and that he did not arrest or charge defendant.

Defense counsel requested a sidebar conference at which she objected to the testimony that a person "was looking in the windows and looking into the cars," in apparent violation of a pretrial agreement that the State would elicit only that the officer responded to "a suspicious person" and not relate that the person was looking into cars and apartment windows; the trial court confirmed that agreement. Counsel moved for a mistrial. The judge denied the motion

26

in light of the State's concession that it would ask further questions to eliminate any prejudice; this testimony followed:

> [ASSISTANT PROSECUTOR]: You later found out that other patrol officers who had spoken to the callers found out that nobody actually looked inside any of the windows of apartment or cars. Is that correct?
>
> [MATAWAN OFFICER]: Correct.
>
> [PROSECUTOR]: So, again, considering that the people who had called had reported no criminal activity, the [defendant] had indicated he was there for a legitimate purpose, looking for his lost bike, you let him go. Correct?
>
> [OFFICER]: That is correct.
>
> [PROSECUTOR]: And he wasn't charged with anything?
>
> [OFFICER]: No, he was not.

Defendant also challenges a reference to multiple burglaries during the Matawan detective's testimony wherein he explained to defendant prior to the first statement, "we had some burglaries going on within the area . . . and just wanted to see if he had any information or knowledge . . . that pertained to our investigations." Defendant also points to references made by detectives during his first statement, which was played to the jury: "we've had a couple different little burglaries in town and some, some thefts"; that defendant had "been seen

out pretty late at night" and "a couple things . . . added up"; "so what about, uh, some of these little burglaries that we've had . . . you know anything about any of them?"; "we've actually recovered some DNA and . . . fingerprints"; "[s]o you basically are . . . saying that you had no involvement in any type of criminal activity in Matawan or Aberdeen."

We, again, note defendant did not object to the contents of the statements, which were redacted for the Matawan trial. Although the record does not contain a clear statement, as there was prior to the Aberdeen trial, that the redacted recordings were acceptable, defense counsel confirmed that the only pretrial issue she raised related to the call to which the Matawan officer responded.

As in the Aberdeen case, neither the Matawan detective's testimony nor defendant's first statement contained any assertion that defendant was involved in the other burglaries or that his fingerprints or DNA were connected to other investigations. In fact, defendant denied involvement in any criminal conduct throughout the interview and the detective admitted before the jury that he did not have fingerprints or DNA, and his statement to defendant that he did was an interview "tactic." In the statement, defendant also responded to the detective's question, "[d]o you stay out real late? You were seen walking around once or

twice before like really early," by explaining that he walked or jogged in the early morning. The detective testified that he "didn't pursue any charges" and "dropped [defendant] off at his girlfriend's house" after the first statement. See State v. Figueroa, 358 N.J. Super. 317, 325-26 (App. Div. 2003) (finding "no abuse of discretion in the trial court's treatment" of the defendant's statement about uncharged robberies because he "did not implicate himself, so it was not other crimes evidence as to him").

Defendant challenges as prejudicial portions of his second statement that indicated there were multiple victims: officers knew he "didn't kill these girls," (emphasis added); "[t]hese girls didn't invite you into their homes. Neither one of them. You know? And neither one of them are dead, thank God, and they're all gonna be okay. You didn't' kill them and I know you didn't want to kill them. And I know you didn't want to hurt them" (emphasis added); and "you like to overpower them." (emphasis added).

Although these references should have been redacted,[6] once again, these three references by the Matawan[7] detective are mingled with dialogue at the end of a long statement during which all of the other many references were solely to the Matawan victim. And, again, the State made no reference to other victims, including the Aberdeen victim, at any other time during the trial, including summation.

The detectives' references to defendant's "problem," "demons," "disease," and "issues" with which he was struggling for "a long time" were contained in different portions of the statement than were played at the Aberdeen trial. Additionally, the Matawan detective responded to defendant's statement that he was going to see a psychiatrist by speculating about the reason: "I don't know

---

[6] During a post-trial motion hearing, the trial court recounted the efforts made to edit the recordings of defendant's interviews, rejecting defendant's contention that evidence of the Aberdeen trial was adduced during the Matawan trial:

> We scrupulously reviewed the . . . videotape of his
> interview and anything that could have referred in trial
> number two to trial number one was redacted. We did
> the best that we could to separate the . . . two videotapes
> so that there would not be unfair prejudice.

[7] We have utilized the official transcription of defendant's redacted second statement that was played before the jury in attributing portions of the colloquy set forth therein to the Matawan and Aberdeen detectives respectively. We note the listening aid supplied by the State reverses these attributions. Regardless of which version is correct, our review is the same.

whether it's a dominance, the overpowering, the anonymity. Maybe it's just a stranger, 'ya know, a fantasy that you're living out, I don't know."

When viewed in context, the detectives' remarks were designed to goad defendant to confess. The Matawan detective, after he offered possible reasons defendant wanted to see a psychiatrist, asked defendant, "What is it? Can you enlighten me on it a little bit? [Because] I'm curious." Later, after the Aberdeen detective told defendant the State's version of the incident, the Matawan detective pressed:

> When . . . it's all over, man, you feel guilty. Right? When something like this happens?
>
> [DEFENDANT]: Yeah, that is some –
>
> [DETECTIVE]: Yeah, I know it's not something you want to do. It's a demon you're struggling with. Right? Am I right?
>
> [DEFENDANT]: Yeah, it could be.

As was the case in the Aberdeen trial, the detectives' comments were not a diagnosis of defendant. And, again, the detectives did not suggest or prove any evidence that there was a source for their comments; they were attributable to the investigative technique the detectives employed.

Contrary to defendant's arguments, the admitted evidence was not clearly capable of producing an unjust result. As in the Aberdeen trial, he was not

31

implicated in the peering or other burglaries and thefts about which he was questioned. Questions about psychiatric issues and the detectives' false statements about DNA and fingerprint evidence were interrogation tactics; no reasonable juror could take the comments to be evidence. And the brief references to other victims, when viewed against the DNA evidence and defendant's statement in which he admitted he was at the crime scene and that he digitally penetrated E.R., did not inject sufficient prejudice in the trial so that the jury – which heard a version of events from defendant and E.R. – would not have found defendant guilty.

Defendant also contends the prosecutor's comments during summation in the Matawan trial require reversal because he "falsely stated that [defendant] lied about where he was on the night of the incident," "unfairly disparaged the defense, vouched for E.R.'s credibility, and played to the jury's passions when he accused the defense of anti-Mexican animus and tied the case to larger issues of sexual assault."

Defendant points to two instances in which the assistant prosecutor accused him of lying to the police during his first and second statement about where he was on the night of the incident, when in fact defendant stated, "I believe I was at my girl's" and that he would "double-check with her." (emphasis

added). The assistant prosecutor commented twice about defendant's prior statements relating to that issue: "He said he was at his girlfriend's . . . . He wasn't. She was working." "When he was brought in shortly after, he said [he] was with [the girlfriend] that night."

When confronted on cross-examination with both statements, defendant admitted that when he told the police that he was at his girlfriend's house on the night of the incident, "[t]hat was not correct." The defendant was then asked, "And when you told the police that you didn't go to your other friend, Tina's[8] apartment who also lived in the Mark Hampton Apartments, that was also a lie because you went there." Defendant answered, "I went there, yes." Defendant admitted, "neither of these turned out to be correct." When defendant was later asked, "And you lied to the police about where you were that evening," he answered:

> Listen, I told the police that I was by Tina's house, the first interview. Due to the circumstances that three officers came to the complex to pick me up, two was Detective Lavallo and his partner and Detective Chevalier. Before they went with me, Katina was telling me that Detective Chevalier is her friend from school. That was her exact words to me.
> So when I went for questioning and they asked me about Tina, I denied being by Tina because I didn't

---

8 Defendant's girlfriend, Katina, was also referred to as Tina during the statements and trials.

know exactly why they actually had me here. I don't know if they looking for information to relate to Tina, about the next Tina, so I denied being anyplace near next to Tina's house.

When they came for me for the second interview, I clarified to them my exact whereabouts that evening. Simple as that.

It was up to the jury, as instructed by the trial court, to determine what the facts were "[r]egardless of what the attorneys have said." The jury was instructed: "in recalling the evidence in this case . . . it is your recollection of the evidence that must and should guide you as judges of the facts"; the jury was told "closings by the attorneys are not evidence and must not be treated by you as evidence." In light of the defendant's statements and cross-examination, we perceive no misconduct, much less prejudicial misconduct, in the assistant prosecutor's comments.

Defendant also contends the prosecutor's statement about E.R. – "She got tied up and she wasn't sexually satisfied so she got angry. Let's face it . . . you know how crazy those Mexicans, are, hot-blooded, and she just called the police" – was improper and prejudicial. While we vehemently decry the assistant prosecutor's insertion of an offensive ethnic stereotype in the trial, we perceive his sophomoric comment reflected on him, not defendant. His imprudent remark was an attempted response to defense counsel's contention in

34

summation that E.R. falsely accused defendant because "she felt so disrespected, she felt hurt, she was angry" that defendant left during a consensual sexual assignation. At no time did the assistant prosecutor attribute those words to defendant. His irresponsible comment responded to the sharply disputed versions of the sexual encounter presented by the State and defense counsel's summation during which she referred to E.R.'s version as a "story" – a false report.

Those disputed facts and defense counsel's comments also gave rise to the assistant prosecutor's purported attempt "to frame the case inside the larger context of sexual assault in America," when he stated:

> In this day and age, ladies and gentlemen, it is disappointing and difficult that we still deal with the myth that women are not sexually assaulted. They're just jilted. They didn't like the men. Oh, he's getting out, I'm going to get back with him. In this day and age when we have jurists on the bench, presidential candidates for both parties that we still have these myths. You go into that jury room with your common sense that balances out, look at the demeanor in which people testify. Look at all the facts and circumstances. And if we go and look at this he said/she said situation. And, again, I hate that term.

Although the prosecutor made comments about "this day and age" and about presidential candidates and jurists, he did not encourage the jury to convict on an improper basis but rather tied his comments back to the disputed evidence at

trial, including defendant's contention that the tryst was consensual and E.R. falsely accused defendant of sexual assault. He did not vouch for E.R.'s credibility.

In light of those disputed facts and defense counsel's comments, we determine defendant's argument that the assistant prosecutor unfairly disparaged the defense by referring to defendant's "story" that E.R. was "jilted" to be without sufficient merit to warrant further discussion. R. 2:11-3(e)(2).

No objection was made to the State's summation. As such, the remarks generally "will not be deemed prejudicial." Timmendequas, 161 N.J. at 576 (citing State v. Ramseur, 106 N.J. 123, 323 (1987)). "The failure to make a timely objection not only indicates the defense did not believe the remarks were prejudicial at the time they were made, but also deprives the judge of the opportunity to take the appropriate curative action." Murray, 338 N.J. Super. at 87-88 (citing Timmendequas, 161 N.J. at 576). Under that lens, we do not perceive the State's summation was "clearly and unmistakably improper" and was "so egregious that it deprived the defendant of a fair trial." State v. Wakefield, 190 N.J. 397, 438 (2007) (first quoting State v. Papasavvas, 163 N.J. 565, 625 (2000); then quoting State v. Smith, 167 N.J. 158, 181 (2001)).

The admission of improper evidence and the assistant prosecutor's improper comments are not errors "sufficient to raise a reasonable doubt as to whether [the errors] led the jury to a result it otherwise might not have reached." Daniels, 182 N.J. at 95 (quoting Macon, 57 N.J. at 336). "The mere possibility of an unjust result is not enough." Funderburg, 225 N.J. at 79 (citing Jordan, 147 N.J. at 422). As was the case in the Aberdeen trial, reversal is not warranted in the Matawan trial.

## C.  Cumulative Error

The cumulative errors in each trial do not require reversal. Defendant did not receive a perfect trial in either case, but he received fair ones. State v. Weaver, 219 N.J. 131, 160 (2014).

## III

Defendant challenges the sentence imposed in connection with only the Matawan trial. He received a twenty-year prison term for first-degree aggravated sexual assault on count four, a ten-year term for second-degree burglary on count three concurrent to count four, and a five-year term for third-degree criminal restraint on count five concurrent to counts three and four.

We determine his argument that "the court did not give [defendant] a full opportunity to allocute," and improperly found aggravating factor one, to be

without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2). He was afforded the right to allocute pursuant to Rule 3:21-4(b).

Contrary to defendant's contention, the court's finding of aggravating factor one was supported by the competent evidence in the record including the trial evidence. State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Natale, 184 N.J. 458, 489 (2005)).

We also reject his argument that the court erred in failing to merge the burglary with the aggravated sexual assault. Our previous analysis of the statutory elements of each of those crimes led "us to conclude that the Legislature intended to and did create separate and distinct offenses for burglary and sexual assault which do not merge." State v. Adams, 227 N.J. Super. 51, 63 (App. Div. 1988); see also State v. Mosch, 214 N.J. Super. 457, 465 (App. Div. 1986); c.f. State v. Cole, 120 N.J. 321, 332-33 (1990).

We do find merit in defendant's contention that the court imposed a $2000 SCVTF penalty, N.J.S.A. 2C:14-10(a)(1) – the statutory maximum amount – "without commenting on the nature of the offense, [defendant's] ability to pay despite his indigent status, or the reasons for imposing the maximum penalty." "[T]he sentencing court should provide a statement of reasons when it sets a defendant's SCVTF penalty within the statutory parameters." State v. Bolvito,

A-4224-15T1

217 N.J. 221, 235 (2014). The court is required to assess "a defendant's ability to pay" by looking "beyond the defendant's current assets and anticipated income during the period of incarceration." Id. at 234. There is no indication this was done here, requiring vacation of the SCVTF penalty and a remand for the purpose of reassessing the penalty amount. Furthermore, during the remand proceedings the court should award defendant additional jail credit; the State concedes defendant is entitled to one day jail credit from the date of his arrest on September 28, 2012.

Affirmed in part; remanded to address the SCVTF penalty and to award one day jail credit. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4224-15T1